# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| NEELU PAL<br><br>*Plaintiff*,<br><br>v.<br><br>ROBERT CIPOLLA, et al.<br><br>*Defendants*. | No. 3:18-cv-616 (MPS) |

**RULING ON DEFENDANTS' PARTIAL MOTION TO DISMISS**

Plaintiff Neelu Pal filed suit against various officers in the Wilton Police Department (Robert Cipolla, Robert Smaldone, Michael Tyler, and Scott Sear), emergency medical personnel from Wilton Ambulance (Daniel Monahan and Richard Janes), and the Town of Wilton. (ECF No. 49). Pal's claims arise out of the search of her home and her arrest, detention, and prosecution. Pal alleges (1) deprivation of civil rights under 42 U.S.C. § 1983 (count one); (2) excessive force under 42 U.S.C. § 1983 (count two); (3) unlawful search under 42 U.S.C. § 1983 (count three); (4) malicious prosecution under 42 U.S.C. § 1983 (count four); (5) malicious abuse of process under 42 U.S.C. § 1983 (count five); (6) municipal liability under 42 U.S.C. § (count six); (7) conspiracy to violate civil rights (count seven); (8) assault and battery (count eight); (9) negligent infliction of emotional distress (count nine); (10) intentional infliction of emotional distress (count ten); (11) theft and larceny (count eleven); and (12) negligence (count twelve). (*Id.*). Defendants Cipolla, Smaldone, Tyler, Sear, and the Town of Wilton (collectively, "Defendants") moved to dismiss all state law claims for failure to complete service within the applicable statute of limitations, but later conceded that the state law claims were not time barred. I therefore DENY the motion to dismiss as to the state law claims. Defendants also moved to dismiss the municipal liability claim for

1

failure to state a claim. For the reasons discussed below, the motion to dismiss the municipal liability claim is GRANTED.

**I.  Background**

The following facts are drawn from the second amended complaint, (ECF No. 49), and are accepted as true for the purpose of deciding the Defendants' motion to dismiss.[1]

In April 2015, Pal observed the owner of her son's school and other adults "improperly observing and/or photographing [her] son and other children while the children were undressed and in a bathroom" at the Goddard School of Wilton ("Goddard School"). (*Id.* at ¶ 20). Pal contacted the owner's wife, Debbie Lee, to express her concerns about this incident. (*Id.*). After Pal reported her concerns, Ms. Ahmad ("Ahmad"), an employee of Goddard School, repeatedly contacted Pal. (*Id.* at ¶ 21). Ahmad called Pal and "stated threateningly" that Pal needed to come to the school to "'witness' what Ms. Ahmad intended to do to Debbie Lee and/or . . . the Goddard School." (*Id.* at ¶ 22).

On April 29, 2015, Pal observed someone driving past her home and through her driveway repeatedly; she believed it was Ahmad. (*Id.* at ¶ 26). Pal dialed 911 to reach the Wilton Police Department and reported "suspicious activity near [her] home; improper, voyeuristic and sexually abusive conditions that involved [her] son and other children at her son's preschool . . . and a threatening statement made to [her] by an employee of [her son's school]." (*Id.* at ¶ 19). Pal was put on hold for long periods of time and her calls were terminated by the Wilton Police Department. (*Id.* at ¶ 29). Pal alleges that when she reported her complaint, an unidentified police officer told her "in a threatening tone 'you cannot make trouble for Debbie Lee.'" (*Id.* at ¶ 30). Pal, "frustrated

---

[1] Pal's second amended complaint, (ECF No. 49), is identical to the first amended complaint, (ECF No. 35), except that it includes a corrected caption and corrected paragraph numbers.

2

by the inappropriate response," used profanity to address Cipolla. (*Id*. at ¶ 31). Cipolla called Pal back and told her the police were coming to her house. (*Id.* at ¶ 32). Pal contends that Cipolla, Smaldone, and Tyler went to her house to arrest her without a warrant or probable cause. (*Id.* at ¶ 33).

Pal remained inside her home when the officers arrived. (*Id*. at ¶ 36). She asked the officers for identification, which they refused to provide. (*Id*. at ¶ 36). The officers approached Pal in a "physically threatening manner" and Pal closed the door of her home. (*Id*. at ¶¶ 36-37). The officers forced open the door and entered Pal's home without permission or a warrant and arrested her. (*Id*. at ¶ 38). Pal repeatedly told them to "get out of [her] house." (*Id*. at ¶ 39). When Pal asked why she was being arrested, Smaldone said "words to the effect of 'we told you to stop calling.'" (*Id*. at ¶ 40).

Cipolla, Smaldone, and Tyler "physically and violently dragged" Pal out of her home. (*Id*. at ¶ 41). They handcuffed, searched, and "repeatedly and forcefully grop[ed] [Pal's] breast," and then forced Pal into the rear of the police cruiser. (*Id*. at ¶ 41). Pal did not resist or threaten the officers. (*Id*. at ¶ 42). During the encounter, Tyler referred to Pal as "[M]uslim bitch" and Smaldone made other derogatory comments toward Pal and threatened to use his taser on her. (*Id*. at ¶ 44). Pal's four-year-old son ran frantically between the police cars and Pal heard the officers tell strangers that they were looking for someone to take Pal's son because they were going to "take [Pal] away." (*Id*. at ¶ 46).

Next, Cipolla and Smaldone called an ambulance. (*Id*. at ¶ 47). At approximately 2:40 p.m., Cipolla, Smaldone, and Tyler, along with emergency medical personnel, Monahan and Janes, handcuffed Pal and restrained her inside the ambulance. (*Id*. at ¶ 48). Monahan, Janes, and Smaldone then "removed portions of her clothing, and subjected her to physical assault and sexual

assault." (*Id.* at ¶ 49). They also injected a substance into Pal's arm. (*Id.* at ¶ 50). Because of the injection, Pal lost consciousness for a period of time in the ambulance. (*Id*. at ¶ 52). On the way to the hospital, the ambulance made multiple stops. (*Id*. at ¶ 51). Pal was released about four hours after she arrived at the emergency room. (*Id*. at ¶ 53).

Later that day, Cipolla, Tyler, and Smaldone entered Pal's home without a warrant, permission or purpose. (*Id*. at ¶ 56). Cipolla conducted a search upstairs in Pal's home. (*Id*. at ¶ 56). Pal's child witnessed Cipolla opening drawers and closets and removing contents from within them. (*Id.*). Upon returning home, Pal discovered that she was missing $404 and gold jewelry worth over $4,000. (*Id.*). Pal contends that the officers took the money and jewelry during their search. (*Id.*).

Also, on April 29, 2015, Cipolla, Tyler, and Smaldone, as well as "other unknown persons," used their personal cellphones to discuss Pal. (*Id*. at ¶ 59). During one call, Cipolla said "we pulled her out (of the home), and toughed her up [*sic*] like we were arresting her." (*Id*. at ¶ 60). Later, the officers were recorded on a body microphone talking about how to create false incident reports. (*Id.* at ¶ 61). One of the officers said: "we can say we were here for investigation [*sic*] and put her in handcuffs." (*Id.*). Pal alleges that the officers falsified documents and testimony against her. (*Id.* at ¶ 63). On May 25, 2015, Pal demanded in writing that the Wilton Police Department preserve audio and video from April 29, 2015 as well as any subsequent recordings related to the events of that day. (*Id.* at ¶ 62).

On or about June 1, 2015, Smaldone and Monahan "created affidavits that contained false statements and information[] to support a warrant" for Pal's arrest. (*Id.* at ¶ 63). Pal contends that the officers "prepared false, fraudulent and misleading incident reports, and made false, fraudulent, and misleading statements to their superior officers and to the prosecuting attorney." (*Id.*). On

June 7, 2015, Pal was arrested and charged with "misuse of 911 in violation of CGS § 53-182d" as well as "assault on safety personnel in violation of CGS § 53a-167c" and "attempted assault on safety personnel in violation of CGS § 53a-49." (*Id*. at ¶ 64).

On August 18, 2015, Pal submitted a written complaint to Chief Crosby and Sargent Tunney of the Wilton Police Department about the actions of Cipolla, Smaldone, Tyler, Monahan, and Janes. (*Id.* at ¶ 65). At the time she filed her second amended complaint, Pal had not received any information about the status of her complaint or whether a complaint number had been assigned. (*Id*. at ¶¶ 65-66).

On March 6, 2017, Pal missed a hearing in her criminal case, and the court charged her with failure to appear and issued a $5,000 non-surety bond. (*Id.* at ¶¶ 70-72). Pal voluntarily turned herself in to the Wilton Police Department and when she tried to leave, Cipolla and Sears "detained, threatened, assaulted, imprisoned and forcibly prevented" her from leaving the station unless she paid them $5,000 in cash. (*Id.* at ¶ 73). On May 10, 2017, the State's Attorney abandoned the charges of misuse of 911, assault on a safety personnel, and attempted assault on a safety personnel. (*Id* at ¶ 75). On May 10, 2017 the State's Attorney "entered a long form substitute charge of infraction of creating a public disturbance in violation of CGS § 53-181(a)(3)." (*Id.* at 76.) On October 4, 2017, after a bench trial, Pal was convicted of "creating a public disturbance." (*Id*. at ¶¶ 78, 81).

On April 10, 2018, Pal commenced this action against Cipolla, Smaldone, Tyler, Sear, Monahan, and Janes in their individual and official capacities, and against the Town of Wilton.

## II. Legal Standard

Defendants seek to dismiss the municipal liability claim under Rule 12(b)(6) for failure to state a claim. In deciding a motion to dismiss under Rule 12(b)(6), the court must determine

5

whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). In considering such a motion, the court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010). "When a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant defendants['] motion to dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.[2]

### III. Discussion

Defendants move to dismiss Pal's municipal liability claim for failure to state a claim. A municipality is liable under § 1983 only if it had a "policy or custom" that caused the plaintiff's injury. *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff may establish

---

[2] Pal brought suit *pro se*, but later retained counsel who filed two amended complaints and an opposition to Defendants' partial motion to dismiss. Pal is now self-represented once again. Because Pal was represented by counsel when the operative complaint and motion to dismiss briefs were filed, the Court does not apply the highly liberal construction rule applicable to *pro se* pleadings in the Second Circuit. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) ("It is well established that the submissions of a pro se litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'") (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

6

a policy or custom in one of four ways: "by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those whom municipal employees will come into contact." *Aquino v. City of New York*, 2017 WL 384354, at *3 (S.D.N.Y. Jan. 25, 2017) (internal quotation marks and citations omitted). I now assess whether Pal's allegations are sufficient to establish municipal liability in any of these ways.

### A. Formal Policy

A municipality may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. A formal policy is therefore created when policymakers for the municipality adopt an action or policy goal. *See Monell,* 436 U.S. 658 at 694 (finding that a written policy requiring pregnant employees to take early unpaid leave was "unquestionably" a formal policy); *Missel v. County of Monroe*, 351 Fed. Appx. 543, 545 (2d Cir. 2009) ("[Plaintiff] has made no allegation that any official policymaker or policymaking body took any action to establish either of the policies he alleges. The allegations that [the officer] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient."). The Second Circuit has held that a municipality must make a conscious choice to engage in the action for it to qualify as a formal policy. *Vives v. City of New York*, 524 F.3d 346, 352 (2d Cir. 2008) (explaining that a *Monell* policy "will ordinarily be the result of a conscious choice" and "there must have been conscious decision making by the City's policymakers before the City can be held to have made a conscious choice");

*see also Rogoz v. City of Hartford*, 2012 U.S. Dist. LEXIS 136405 (D. Conn. Sept. 24, 2011) (finding that the Plaintiff had not alleged enough facts to support his claim that the Chief of Police's failure to train and supervise was a "conscious choice."); *Corr. Officer Benevolent Ass'n v. Kralik*, 2011 WL 1236135, at *26 (S.D.N.Y Mar. 30, 2011) (finding that a municipal action was not a conscious choice when the action was required by a state commission.)

Pal alleges that several officers refused to accept her complaints and requests for assistance. (ECF No. 49 at ¶ 132). She also alleges that she was repeatedly disconnected from 911 and was told by officers that it was "policy" not to accept her complaints and requests for assistance. (*Id.*). This is insufficient to establish the existence of a "formal policy." Pal has not identified any formal policy, regulation, or ordinance promulgated and enforced by Wilton that accounts for the events outlined in her complaint. Nor has she alleged facts showing that the municipality made a "conscious choice" to adopt a policy of not accepting complaints by citizens calling 911. Finally, because her allegation that she was told it was "policy" not to accept her 911 calls appears to be related to her initial calls to the police on April 29, and because she alleges that officers did ultimately respond to her home on April 29 (ECF No. 49 at ¶¶ 29-34, 132), she has failed to allege facts showing that a supposed "policy" not to accept her requests for assistance caused the alleged violations of her constitutional rights; indeed, she alleges that the officers' actions in responding to her calls is what violated those rights. (ECF No. 49 at ¶¶ 29-34). Thus, Pal has not plausibly alleged municipal liability premised on a formal policy.

### B. Custom

Pal next argues that the actions of the Wilton Police Department constitute a "custom." Specifically, she claims that "[t]he acts complained of were carried out . . . pursuant to the customs . . . of the Defendant TOWN OF WILTON" and "[t]he refusal of the Chief of Police . . . to

investigate the plaintiff's complaints . . . demonstrates a custom or policy . . . of condoning, ignoring, refusing to correct or investigate constitutional misconduct of its police officers." (ECF No. 49 at ¶ 130).

A policy need not be officially promulgated for a municipality to face liability. *Green v. City of New York*, 465 F.3d 65, 80 (2d. Cir. 2006) ("[Municipal Liability] may be maintained based on a practice that was so *persistent or widespread* as to constitute a custom or usage with the force of law. The alleged custom or practice need not be embodied in a rule or regulation. However, the alleged practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials.") (internal quotation marks and citations omitted) (emphasis added). To survive a motion to dismiss under this theory, the plaintiff must plead enough facts to show the existence of a pattern of behavior amounting to a custom or practice and that the local government, when faced with the pattern, did nothing in response. *See Masciotta v. Clarkstown Cent. Sch. Dist.*, 136 F. Supp. 3d 527, 546 (S.D.N.Y. 2015) (explaining that a plaintiff must allege facts "tending to support, at least circumstantially, an inference that such a municipal policy or custom exists" to survive a motion to dismiss); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.")

Pal asserts that there was a custom within the department of ignoring or condoning misconduct, but does not plead facts showing a pattern of such behavior by the Wilton Police Department. Her allegations are either conclusory or based on isolated incidents. (ECF No. 49 at ¶ 122) ("The actions complained of were carried out by the . . . Defendants . . . pursuant to the customs, policies, usage, practice and rules of the Defendant TOWN OF WILTON."); *id.* at ¶ 123

9

("The customs, policies, usages, practices, procedures and rules of defendant TOWN OF WILTON constitute a deliberate indifference to the safety, well-being and constitutional rights of the Plaintiff."); *id*. at ¶ 129 ("The refusal of the Chief of Police . . . to investigate the plaintiff's complaints of unconstitutional misconduct of its officers demonstrates a custom or policy within the defendant Town of condoning, ignoring, refusing to correct or investigate constitutional misconduct of its police officers.") Pal also alleges that her requests for police assistance via 911 as well as her written complaints were repeatedly ignored. (ECF No. 49 at ¶¶ 29, 66).

These allegations are insufficient to establish an inference that Wilton had a "custom" of: (1) ignoring or failing to discipline accused officers or (2) ignoring citizen 911 calls. Pal has not alleged facts showing a pattern of such behavior. In her complaint, she cites only a few incidents of misconduct by police, all involving her —her interactions on the night of April 29, 2015; her experience on March 6, 2017; and the alleged falsification of testimony and reports. She has not alleged any facts suggesting that similar events happened repeatedly over time or that such events happened to other people. Thus, she has failed to plead a "widespread" or "persistent" practice permitted by the municipality. The conduct of one group of officers against one individual on a few occasions is insufficient to establish an unwritten policy or custom. Pal has not shown that her injury was caused by "anything other than the individual acts of the [defendants]." *Simms v. City of New York*, 2011 WL 4543051, at *2 (E.D.N.Y 2011); *see Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("Isolated acts of excessive force are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability.") (internal quotations and citations omitted); *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir. 1993) ("A single incident in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy.");

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) (finding that a single incident of excessive force was insufficient to establish a custom within the police force).

Pal also states that the Chief of Police did not investigate her complaint and that this demonstrated a custom of "condoning, ignoring, refusing to correct or investigate constitutional misconduct of its police officers." (ECF No. 49 at ¶ 130). However, Pal has not alleged facts showing that she did not receive a response to her complaint because of an unwritten custom of ignoring improper behavior by officers rather than, for instance, administrative negligence in this one case. *Compare Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871-73 (2d. Cir. 1992) (finding that, within the police department, there was sufficient evidence of a custom to support the jury's verdict in part due to the expert testimony, statistical evidence, and comparison of treatment which showed a widespread, unwritten practice of discrimination).

For the foregoing reasons, Pal has failed to plausibly allege the existence of a custom within the Town of Wilton Police department that resulted in her injuries.

### C. Final Policymakers

A policy or custom may also be attributed to a municipality if the action or decision was made by a "final municipal policy maker." *Aquino*, 2017 WL 384354, at *3; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("[T]he power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly envisioned other officials 'whose acts or edicts may fairly be said to represent official policy,' and whose decisions therefore may give rise to municipal liability under § 1983.") A single decision by a policymaker with final decision-making authority may be enough to establish municipal liability under *Monell*. *Id*. However, the decision of a final policymaker subjects a municipality to liability "where—and only where—a deliberate choice to

follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483; *see also Amnesty Am. v Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) (vacating a grant of summary judgment where a reasonable juror could find that the Chief of Police made a deliberate choice to ignore the misconduct of his subordinate officers given that he was present at demonstrations at which officers inflicted pain on protesters).

Pal asserts that she sent a complaint to the Chief and his decision to ignore it shows that he made a deliberate choice to affirm the conduct of his subordinate officers. *See Amnesty Am.*, 361 F.3d at 126 ("Thus, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. One means of doing so, of course, is to establish that a policymaker ordered or ratified the subordinates' actions."). Pal submitted a written complaint to the Chief of Police on August 18, 2015. (ECF No. 49 at ¶ 65). However, the events of April 29, 2015 occurred before Pal filed her written complaint with the Chief of Police. The Chief cannot be said to have "ordered" the subordinate officers' actions prior to August 18, 2015 because there are no facts alleged showing that the Chief knew of those actions. Similarly, Pal does not allege facts that show the Chief "ratified" or "acquiesced" in the subordinate officers' actions. The decision to "ignore" Pal's complaint is not sufficient to show acquiescence. There are other plausible explanations for the Chief's decisions not to respond, including, as noted, administrative negligence. Pal does not allege facts that support an inference that "ignoring" Pal's complaint showed that the Chief was affirming the officers' conduct. *See Gomez v. City of Norwalk*, 2017 WL 3033322 at *3 (D. Conn.

July 17, 2017) (finding a plaintiff had not alleged enough facts to support a claim that the city and Chief of Police "acquiesced in a pattern of unconstitutional conduct by subordinate officers").

Pal also fails to allege sufficient facts showing causation. She asserts that the Chief's failure to investigate "subjected [her] to further detention, until she was unlawfully coerced into paying a surety bond in cash" and that the actions of the Chief set a "policy" which subordinate officers "followed diligently." (ECF No. 47 at 14). To establish municipal liability based on the actions of a final policymaker, a plaintiff must identify a causal connection between the action and the injury suffered. *Monell* 436 U.S. at 694. *See also Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) ("A plaintiff may prove the causation element by showing either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights . . . or that while the policymaker himself engaged in 'facially lawful . . . action,' he indirectly caused the misconduct of a subordinate municipal employee.") Pal does not plead enough facts to show a plausible connection between the decision to ignore her August 18, 2015 complaint and events that occurred afterwards, specifically her detention on March 6, 2017. Pal makes conclusory statements about the connection between the Chief's failure to investigate and the injuries she has suffered, but she does not allege facts to support the assertion that the Chief's inaction "indirectly caused the misconduct of [his] subordinate [officers]." *Id.*

Thus, Pal has not plausibly alleged that the Chief of Police for Wilton acquiesced in his subordinates' misconduct or that Pal's injury was the result of a decision that he made.

### D. Failure to Train or Supervise

Pal alleges that her injury occurred due to the Wilton Police Department's failure to train and supervise its officers. She also asserts that her case is one of the rare exceptions where a history

13

of violations is not necessary to establish a failure to train or supervise. I discuss each of these arguments below.

"[A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Inadequate training "may serve as the basis of § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton Ohio v. Harris*, 489 U.S. 378, 388 (1989).

To allege failure to train under § 1983, Pal must plead facts that give rise to a plausible inference that: (1) "[the] policymaker knows to a moral certainty that her employees will confront a given situation;" (2) "the situation . . . presents the employee with a difficult choice of the sort that training or supervision will make less difficult or . . . there is a history of employees mishandling the situation;" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). Pal must also point to a specific deficiency within the training program and cannot allege a general lack of training or that more or better training would have caused the situation to be avoided. *Canton*, 489 U.S. at 391; *see also Venghaus v. City of Hartford*, 2012 WL 1050014 at *12 (D. Conn. Mar. 27, 2012) (explaining that the plaintiff failed to provide evidence of a specific deficiency within the police training program that led to plaintiff's arrest without probable cause).

Pal does not allege facts supporting any of these requirements. She makes no specific allegations about the Town's training program. Rather, she makes only general allegations that the officers were not trained and asserts that their behavior evidences this lack of training. *See, e.g.*, ECF No. 49 at ¶ 129 ("The refusal of the Chief of Police of the defendant Town of Wilton to

investigate the plaintiff's complaints of unconstitutional misconduct of its officers demonstrates a lack of proper training and supervision in and by defendant Town."); *Id.* at ¶ 132 ("[N]umerous officers refused to accept the plaintiff's complaints and requests for police assistance via 911, and repeatedly delayed and disconnected her from that reporting and assistance seeking line, while concurrently claiming that it was 'policy' to not accept her complaints and requests for assistance, demonstrates both official policy or custom endorsing or being deliberately indifferent to constitutional violations, and the inadequacy of supervision and training of Town of Wilton Police Officers.") This is insufficient. *See Adams v. City of New Haven*, 2015 WL 1566177 at *4 (D. Conn. Apr. 8, 2015) ("Plaintiff has made no more than a general allegation that defendants failed to adequately train and instruct [police] officers regarding the Fourth and Fourteenth Amendment rights of persons."); *Triano v. Town of Harrison*, 895 F. Supp. 2d 526 (S.D.N.Y. Sept. 26, 2012) (dismissing a failure to train claim where the plaintiff did not provide evidence of a pattern of similar violations); *Marte v. N.Y. City Police Dep't*, 2010 WL 4176696, at *3 (S.D.N.Y. July 14, 2015) ("Moreover, the plaintiffs have not pled facts suggesting that the constitutional deprivations they suffered were the consequence of training or supervisory deficiencies. Plaintiffs do not identify procedural manuals or training guides, nor do they highlight relevant particular aspects of police training or supervision.")

Pal also alleges failure to supervise as the basis for her *Monell* claim. (ECF No. 49 at ¶ 129). A municipality can be held liable for failure to supervise when "the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (1995); *see Amensty Am.*, 361 F.3d at 128-29 (finding that the Police Chief's presence and involvement in the violation of constitutional rights raised a genuine dispute of fact concerning a failure to adequately supervise). Pal does not allege facts that support a failure to

supervise claim. Pal makes conclusory statements about the Chief's supervision but does not provide any factual support for these statements. (*See, e.g.*, ECF No. 49 at ¶¶ 129, 132). Pal does not plead facts to show that the Chief of Police had any reason to believe there was a need for more or better supervision of his officers at the time of the incident. While it is true that Pal did file a complaint with the Chief of Police on August 18, 2015, she has not alleged facts to show that the need for supervision was "obvious" at the time of the incident on April 29, 2015. (ECF No. 49 at ¶ 65). Nor did she plead facts to support a failure to supervise claim based on the events of March 6, 2017. There is nothing in the complaint suggesting that it was "obvious" that, two years after the original incident, the Chief's subordinate officers would unlawfully detain Pal within the station. Because the need for more or better supervision was not obvious, I find that Pal has not stated a claim for municipal liability under a failure to supervise theory.

**IV. Conclusion**

For the reasons set forth above, the motion to dismiss the municipal liability claim is GRANTED.

IT IS SO ORDERED.

/s/ MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
July 8, 2019