<u>AFFIDAVIT AND SWORN STATEMENT OF NEELU PAL</u>

I, Neelu Pal, swear under penalty of perjury that the below statements in the following paragraphs, 1 through 282, are true based upon my direct and personal knowledge:

1. On April 29, 2015 I called the Wilton Police Department, and the 911 emergency call system maintained and operated by the Wilton Police Department, to report the suspicious activity of an unknown person repeatedly driving a dark colored sports utility vehicle (SUV) through the driveway of my home and on the streets in front of my home, and immediately adjacent to my home.

2. On April 29, 2015, when I made the phone calls to the Wilton Police department, I believed that the person driving the dark SUV may have been Asma Ahmad, or some other person.

3. On April 29, 2015, when I made the phone calls to the Wilton Police department, I did not know with certainty the identity of the person driving the dark SUV, and I so stated to the Wilton Police personnel.

4. On April 29, 2015, when I made the phone calls to the Wilton Police department, I described the dark SUV to the Wilton Police personnel as being similar in appearance to my own car, a silver-gray Honda, but of a darker color.

5. During December 2014 through April 2015 Asma Ahmad, and her sister Aisha Ahmad, were employed as child care providers at the daycare and preschool known as the Goddard School of Wilton.

6. During December 2014 through April 2015, the Goddard School of Wilton was owned jointly, as a business formation known as "Big Dreams LLC", by Deborah O'Leary Lee (aka Debbie Lee), and Debbie Lee's husband, Edward E. Lee.

7. During multiple and various days between April 1, 2015 and April 20, 2015 I personally observed Edward Lee standing within my four year old child's preschool classroom of the Goddard School.

8. During the times that I observed him in the preschool classrooms, Edward Lee was holding a cellphone in his hand, with arm extended and pointed toward the open bathroom door where there was a clearly visible partially undressed child standing near the sink or adjacent to the toilet.

9. On multiple different days between April 1, 2015 and April 20, 2015 I saw a male parent standing and staring at undressed children within the bathroom, while the bathroom door was open.

10. On and after April 21, 2015, my four year old child repeatedly refused to attend the Goddard School of Wilton, and told me he was scared of Ms. Debbie and "her husband".

11. My four year old child stated to me that Ms. Debbie's husband's name was "Ed" or "Kevin".

12. After April 21, 2015 my four year old child expressed extreme fear and became tearful when he had to attend the Goddard School of Wilton.

13. Beginning April 23, 2015, Asma Ahmad began repeatedly and excessively calling and texting me on a daily basis.

14. During these phone calls Asma Ahmad insisted that I had to hire her as a nanny for my son, so she could "protect him".

15. During the phone calls Asma Ahmad repeatedly stated her anger, dissatisfaction and hatred towards Debbie Lee.

16. During the phone calls, Asma Ahmad stated to me multiple times that Debbie Lee was "doing something really bad" and was "breaking the rules with the kids" enrolled at the preschool and that "Debbie Lee is doing illegal things" at the preschool.

17. During one of the phone calls on April 24, 2015, Asma Ahmad stated to me that she, Asma, was very concerned about Edward Lee being present in the preschool classrooms and child care areas at the Goddard School of Wilton.

18. During the phone calls to me, Asma Ahmad repeatedly stated to me that she, Asma, was going to "do something to Debbie Lee at the preschool" and that she, Asma Ahmad, wanted me to come

to the Goddard School of Wilton to "witness" this event that Asma was planning.

19. During the phone calls Asma wanted to know the times that I would be picking up my child so that she Asma, could meet with me in the parking lot prior to her planned confrontation with Debbie Lee which she, Asma, wanted me to "witness".

20. During one of the phone calls on April 27, 2015 Asma Ahmad stated that she wanted to come to my home to meet with me regarding Debbie Lee. When I refused, Asma became very upset, started crying and stated to me "F█████ Debbie, she will suffer for what she is doing to me, it will happen for sure…". Asma then terminated the phone call.

21. I repeatedly told Asma Ahmad verbally on the phone and via text messages that I did not want to be involved in any altercations between her, Asma, and the owners of the Goddard School of Wilton, Debbie and Edward Lee.

22. I informed Debbie Lee multiple times about Asma Ahmad and her repeated phone calls, text messages and statements of threats that she, Asma, was going to "do something to Debbie" that I had to "witness".

23. I also informed Debbie Lee that at various times I had seen her husband Edward Lee within the classroom, with the adjacent bathroom/toilet door open and undressed children within the bathroom and that Edward Lee appeared to be pointing a

4

cellphone and taking photographs of the children at these times.

24.  I informed Debbie Lee that at various times I had seen other adults, present within the preschool classroom improperly observing the children at times when the adjacent bathroom/toilet door open and undressed children within the bathroom were clearly visible.

25.  I informed Debbie Lee multiple times of my concern that children, including my son, in the preschool were being improperly observed and photographed, while the children were undressed and in the bathroom or toilet area adjacent to the classroom.

26.  I requested verbally and in writing that Debbie Lee address my concerns fully, including my concerns about Asma, and to ensure that children, including my son, were safe while at the Goddard School.

27.  Debbie Lee made no verbal response at these times when I expressed my concerns to her.

28.  Due to this lack of response from Debbie Lee and the continued phone calls and text messages from Asma Ahmad, I became increasingly concerned for the safety of my child and after April 25, 2015 I stopped bringing my child to the Goddard School of Wilton.

29. On April 28, 2015, I emailed Debbie Lee about some of my concerns which I had stated to her verbally over the previous few days.

30. On April 29, 2015 at approximately 11:10 AM I noticed a dark colored SUV repeatedly being driven through the driveway of my home, and in the street in front of and adjacent to my home.

31. At the time, I believed that the driver of the dark SUV was Asma Ahmad.

32. On 4-29-2015, at 11:20 AM I called Debbie Lee at the Goddard school and informed her that I believed Asma was driving back and forth outside my home and in the driveway, to find out whether Debbie had taken and steps to resolve her dispute with Asma, and whether Debbie was going to make a police report about the threatening statements that Asma had made.

33. Debbie Lee stated to me that the dispute between her and Asma Ahmad was still ongoing, and was about "her paycheck" and that Debbie Lee was worried that Asma Ahmad had a "plan". Debbie Lee, then stated something indiscernible about "corporate", and terminated the call.

34. On April 29, 2015, at 11:31 am, I called the Wilton Police department local phone number in an attempt to report the

suspicious activity and the preceding events related to Asma Ahmad, Debbie and Edward Lee and the Goddard School of Wilton.

35. On 4-29-2015 I made the following phone calls to the Wilton Police Department number (12038346260) and Wilton 911:

- at 11:31 AM I called 12038346260, and the call lasted 4 minutes and 58 seconds

- at 11:37 am I called 911 and the call lasted 1 minute and 12 seconds

- at 11:38 AM I called 911 and the call lasted 58 seconds

- at 1:17 PM I called 911 and the call lasted 35 seconds

- at 1:27 PM I called 12038346260 and the call lasted 9 minutes and 45 seconds

- at 1:38 PM I called 12038346260 and the call lasted 4 minutes and 29 seconds

- at 1:43 PM I called 12038346260 and the call lasted 3 minutes and 11 seconds

- at 1:47 PM I called 911 and the call lasted 20 seconds

- at 1:48 PM I called 911 and the call lasted 29 seconds

36. During the call that I placed to the Wilton Police department at 11:31 AM phone call, I was placed on a prolonged hold for over 4 minutes, and the call was eventually terminated by the Wilton Police officer Sisenstein, without my being able to fully state my concerns and complaint.

7

37.  During the 11:37 AM call that I placed to the Wilton Police department, while I was still speaking and attempting to convey my complaint, the Wilton Dispatcher John Galpin told me he was disconnecting the call and he did disconnect the call without permitting me to complete what I was stating.

38.  At 11:48 AM I called the Wilton Police number 12038346260 and spoke with Wilton employee officer Sisenstein.

39.  At approximately 11:50 am, a Wilton Police Officer (who I now know to be Robert Smaldone) arrived at my home and identified himself as "Rob".

40.  Immediately prior to Robert Smaldone's arrival at my home at 11:50 AM, I saw the same dark SUV idling in Lee Allen Lane, the street immediately adjacent to my home.

41.  I attempted to show Robert Smaldone the numerous telephone call logs and text messages from Asma Ahmad.

42.  Robert Smaldone refused to look at the text messages and call logs.

43.  I related my concerns to Robert Smaldone about the threatening statements made by Asma Ahmad about Asma planning to "do something" to Debbie at the preschool which Asma wanted me to "witness"; that I was concerned that it was Asma who was driving the dark SUV in front of and through the driveway of my home; that I was upset and concerned about the inappropriate photographing of undressed children at the

Goddard School by adult, including Edward Lee, and that I had communicated this concern to Debbie Lee, and Debbie Lee was not taking any action to stop this improper photographing of children; and, that I was concerned that Debbie Lee and her husband Edward Lee were instigating or encouraging Asma to threaten, intimidate and repeatedly contact me by refusing to instruct Asma, who I believed was still an employee of Goddard preschool, to cease contacting Plaintiff.

44. In response to my stating my concerns about Debbie and Edward Lee and the improper photographing of undressed children at the Goddard School of Wilton, Robert Smaldone stated threateningly that he knew Debbie Lee, and stated to me threateningly "you cannot make trouble for Debbie Lee".

45. Immediately after making this statement, without giving me any chance to further state my concerns fully or to point out where I had last seen the dark SUV and without providing me any response of my previously stated concerns, Robert Smaldone left my home.

46. After Robert Smaldone's departure I continued to remain within the home with my four year old child, and I could still view the same dark SUV idling in Lee Allen Lane, the street immediately adjacent to my home.

47. After a while I saw that the dark SUV resumed driving intermittently through the driveway of my home and in front of my home.

48. On one occasion, at approximately 1:10 PM, I saw the dark SUV, once again, idling within the street, Lee Allen Lane, which is immediately adjacent to my home, before driving through the driveway of my home.

49. On one occasion I saw the dark SUV stop at the junction of Lee Allen Lane and Sturges Ridge Road, and a person descended from the SUV and entered onto my home property by walking around the edge of the stone wall, and into an overgrown area of the property.

50. Fearing an imminent home invasion or a break-in, I called 911 and the Wilton Police department number. During these times I was variably told words to the effect that I should call the Wilton Police main line, that my concern had already been addressed, that I had nothing to worry about, and then the calls were terminated.

51. During one of the phone calls Robert Smaldone spoke with me and restated to me, again, words to the effect "don't be starting any more issues for Debbie".

52. During one of the calls, I asked to speak with a "supervisor' and was connected to Robert Cipolla.

53. When I attempted to state my concerns and complaints, Robert Cipolla stated to me words to the effect "where is your husband"?

54. In anger and frustration at this dismissive response, I used profanity to address Robert Cipolla. I also informed Cipolla that I would be making a complaint about him and the other Wilton Police employees involved.

55. Robert Cipolla disconnected the call.

56. Shortly thereafter, at 1:50 PM I received a phone call from Robert Cipolla wherein he stated to me that he was coming to my home.

57. I did not yell or scream during any of the phone calls with Wilton Police personnel.

58. At 2:25 PM Robert Cipolla, Robert Smaldone and Michael Tyler arrived at my home in three separate Wilton Police cars.

59. At this time I was standing within the home near a partially open window which is adjacent to the front door of the home.

60. Through the open window I heard Robert Cipolla state to Tyler and Smaldone the words "we'll make sure it is a medical issue".

61. Through the open window I heard Michael Tyler state "and the religion, there was a religion complaint here".

62. Robert Cipolla then rang the front doorbell of my home.

63. I partially opened the front door and remained within the foyer area of my home at all times.

64. Robert Smaldone stated loudly and threateningly to me "Why don't you come on out this time?".

65. I refused to do so and did not exit the home. I remained within the home at all times, with the door partially opened.

66. I asked for the names of the three Wilton Police Officers and had a notepad ready to write down their names.

67. Seeing the notepad in my hand Robert Cipolla stated "wait….what is this?"

68. I asked for the Wilton Police Officers names again, and they refused to provide their names.

69. Robert Smaldone stated threateningly to me "yeah, I was nice enough to give you my first name before."

70. I asked Robert Smaldone for his card.

71. Robert Smaldone stated to me threateningly "I don't have a card" and "don't talk to me like that".

72. I stated to Robert Cipolla, Robert Smaldone and Michael Tyler "I will be making a complaint, because I am not about to put up with this bullshit, I will be calling the freaking police department and making a complaint".

73. As soon as I stated I would make a complaint, Cipolla, Smaldone and Tyler pushed the door fully open and Cipolla

entered inside my home and grabbed my right upper arm, twisting it forcefully.

74. Robert Smaldone and Michael Tyler entered my home and pushed me backwards in the process.

75. To steady myself I held on to a staircase baluster located approximately seven to eight feet from the threshold and the front door of the home.

76. I protested loudly and stated "get out of my house…out, out".

77. Robert Cipolla stated to me "know what, you're under arrest".

78. When I asked why I was under arrest, Robert Cipolla stated to me "You kept calling 911, we told you not to call 911."

79. Michael Tyler and Robert Smaldone forcefully handcuffed me and dragged me out of the home and down the front steps of the stoop.

80. While I was being dragged out of my home, my head and the right side of my upper body was slammed against the door frame.

81. While dragging me towards the Wilton Police Car in the driveway, Michael Tyler stated to me "you muslim bitch, say goodbye to your kid, you're not going to see him again."

82. Robert Smaldone and Michael Tyler pushed me into the rear compartment of Wilton Police Car.

83. When I was imprisoned in the rear of the Wilton Police car, I saw Robert Cipolla walking into my home through the front door.

84. While I was imprisoned in the rear of the Wilton Police car I saw that multiple people had gathered outside the front boundary stone wall of the property of my home and were looking at the police cars in the driveway.

85. Robert Smaldone and Michael Tyler then opened the rear door of the police car and pulled me out.

86. While pulling me out of the police car Michael Tyler grabbed me around my torso and pulled me towards himself causing me to lose my balance.

87. Robert Smaldone and Michael Tyler then pushed me toward the Wilton Police car and started putting their hands on my person.

88. Michael Tyler reached over from behind and with his right hand grabbed my right breast.

89. At this time I heard Michael Tyler state to Robert Smaldone "that's how you do a pat-down".

90. I simultaneously started to scream for help by stating loudly, "help me, help".

91. I saw my four year old child, crying and running around barefoot between the Wilton Police cars, and other parked vehicle(s).

92.  Shortly after this Michael Tyler and Robert Smaldone pushed me back into the rear compartment of the Wilton Police car and closed the door.

93.  While imprisoned in the rear of the Wilton Police car, I saw Robert Cipolla exiting the front door of my home.

94.  While imprisoned in the rear of the Wilton Police car, I my four year old child, unsupervised, crying and running barefoot between the various police cars and other vehicles.

95.  While I was imprisoned in the rear of the Wilton Police car I heard Robert Cipolla engaging in a discussion with an unknown woman who was standing on the street.

96.  I heard Robert Cipolla state to the unknown woman "We had a problem here today, so she is under arrest, we are looking for someone to watch the child".

97.  Upon hearing this I became terrified for my son's safety and continued to scream for help by yelling "help me please, help my son". After this time, I could no longer see my four year old child.

98.  While I was imprisoned the back of the Wilton Police car, Robert Smaldone reached in through the window multiple times and repeatedly continued to reach towards me, touched my person and caused my arms to become increasingly twisted.

99.  In fear, anger and pain I continued to loudly and repeatedly call for help; I admit that I did address the

Wilton Police using profanities such as "j███ a████" and "f█████ a███████".

100. I repeatedly and loudly asked the Wilton Police to let me see my son, which they did not do.

101. I saw see Robert Cipolla, Robert Smaldone and Michael Tyler standing near the Wilton Police car, peering in and reaching in through the windows towards me.

102. I could see Robert Cipolla, Robert Smaldone and Michael Tyler standing, smirking and laughing outside the exterior of the Wilton Police car.

103. While I was in the police car, Robert Smaldone leaned in towards the window and stated to me "brown bitch", and stated "stop yelling otherwise…" gesturing with his hand which was placed on a Taser in a belt holster.

104. In response I called Robert Smaldone "white boy".

105. I heard the dispatch audio within the police car stating that Robert Cipolla or some other member of the Wilton Police department was on the phone with my husband.

106. I repeatedly called out to the Wilton Police Officers to let me speak with my husband, but they did not allow me to speak to my husband.

107. While I was imprisoned in the back of the Wilton Police car I saw Michael Tyler going into my home through the front door.

108. While I was imprisoned in the back of the Wilton Police car, I heard Robert Cipolla and Robert Smaldone talking to an unknown male about leaving the my four year old child with him.

109. While I was imprisoned in the back of the Wilton Police car I heard the unknown male state to Robert Cipolla "it will be better, we will take the child".

110. While I was in the back of the Wilton Police car I heard Robert Cipolla and Robert Smaldone discussing how to fabricate charges against me, and I heard Robert Cipolla state "we add risk of injury....that will do it" and "we ship her off with EMS, add disorderly".

111. While I was in the back of the police car, Robert Smaldone reached into the car then and stated to me "we having complications yet?"

112. While I was in the back of the Wilton police car I heard a male voice on the dispatch radio stating to Robert Cipolla "ok, EMS, responding, non-priority".

113. I remained imprisoned in the rear of the Wilton Police car, extremely distraught and in a state of panic at not knowing the whereabouts of my four year old child; in severe pain, fear and anger I continued to loudly call for help.

114.  When the Wilton EMTs presented to the scene, I told them I wanted to see my son and to speak with my husband.

115. I asked the Wilton EMTs their names.

116. The Wilton EMT who I now know to be Daniel Monahan, did not give me his actual name and instead stated that his name was "Rick James".

117. The Wilton EMT who I now know to be Richard Janes, stated to me that he was "Rick" and at various other times stated his name as "Danny".

118. On January 16, 2020 I conducted a vide recorded deposition of Richard Janes. As a result I personally witnessed Richard Janes identify himself truthfully and accurately by his name.

119. As a result of the deposition of January 16, 2020 I can absolutely and unequivocally identify which specific actions were undertaken by Richard Janes and Daniel Monahan in the incident of 4-29-2015.

120. The Wilton EMTs, Richard Janes and Daniel Monahan asked me my medical history and I informed them that I had a history of PTSD and late stage miscarriage, that I had no history of substance abuse, that I was not on any medications, and that I was a physician.

121. Richard Janes stated to me "we are going to make you go to the hospital".

122. Daniel Monahan stated to me that if I did not "cooperate" with him he was going to have Robert Smaldone "tase" me.

123. I heard Daniel Monahan state to Robert Cipolla "we can handle her, if she doesn't calm down we needle her".

124. At all of these times I was imprisoned in the rear of the Wilton Police car, handcuffed and not presenting any physical threat or resistance in any manner.

125. At all of these times I was imprisoned in the rear of the Wilton Police car, and was only loudly and verbally protesting and remonstrating, repeatedly asking why I was being detained, and demanding to see my four year old child.

126. I refused to go anywhere, and to loudly and forcefully state that I wanted to see my child.

127. I saw my nine year old daughter arrive by school bus to my home at 240 pm.

128. I called out to my daughter to call my husband and to find my four year old child and stay with him.

129. I saw my daughter attempt to walk towards me and the Wilton Police car that I was imprisoned in.

130. I saw Robert Cipolla grasp my daughter by the arm and forcibly lead her towards the front door of the home, and she entered the home.

131. I saw the Wilton EMTs bring the stretcher to the side of the Wilton Police car and I became frantic and terrified about being forcibly transported to the hospital for no medical reason.

132. I was extremely distraught since I did not know where my four year old child was and I did not know who was within the home with my nine year old daughter.

133. I continued to protest loudly, call for help and refused to go anywhere, and demanded to see my children.

134. Robert Cipolla and Michael Tyler pulled me out of the police car.

135. At no time did I offer any physical resistance or use physical force towards any of the Wilton EMTs or Wilton Police.

136. The Wilton EMTs and Police removed the handcuffs from behind and replaced the handcuffs in front.

137. I was made to sit on the stretcher and then straps were tightened across my torso and legs securing me to the stretcher. The stretcher was placed, head first into the patient area of the Wilton ambulance, and was adjusted to the fully reclined position by Daniel Monahan and Richard Janes.

138. Within the ambulance, I continued to refuse to go anywhere until I saw my children and my husband.

139. The ambulance was stationary at this time and Richard Janes was within the patient area of the ambulance seated towards the upper end of the stretcher, towards my right hand side.

140. The patient area of the ambulance was connected to and freely accessible from the driver's area.

141. I saw Richard Janes leaning over and stepping over into the drivers areas of the ambulance repeatedly, by walking behind the swivel seat adjacent to the right upper area of the patient area.

142. During discovery I was provided with copies of photographs of the interior of the Wilton ambulance, plate number 2692, by the Connecticut State's Attorney's office.

143. These photographs of the interior of Wilton ambulance 511, marked as 2692 clearly show the patient and drivers area to be connected and accessible via an open doorway.

144. At various times Michael Tyler was also present within Wilton ambulance.

145. I stated "I will never leave my children with someone like him" and I pointed to Michael Tyler who was standing at the foot of the stretcher at the time.

146. Robert Cipolla was standing immediately outside the open rear doors of the ambulance.

147. Robert Cipolla stated that he was going to get a female police officer Diane MacLean to come and stay with my children who I refused to leave alone in the custody of Cipolla, Smaldone or Tyler.

148. I repeatedly informed the Wilton EMTs and Police that I was not willing to go anywhere until I saw my husband or Diane MacLean.

149. Daniel Monahan pushed the stretcher inward in the ambulance so that my head slammed against a metal object or box located at the proximal end of the stretcher within the patient area of the Wilton ambulance.

150. While I was in the Wilton Ambulance Michael Tyler was within the patient area of the ambulance and had moved from the foot of the stretcher to my upper left side of the stretcher.  Michael Tyler was repeatedly kicking my left leg and thigh.

151. I saw Daniel Monahan at the foot of the stretcher speaking on the phone and I heard Daniel Monahan state to Tyler "Smalls wants to go".

152. I saw Michael Tyler exit the Wilton ambulance through the side door located towards the left upper end of patient area, and adjacent to my left upper end of the stretcher.

153. I saw Robert Smaldone get into the passenger area through this side door.

154. Robert Smaldone stayed within the patient area of the Wilton ambulance towards my left hand side.

155. During the time in the ambulance I heard Robert Smaldone, state to Daniel Monahan and Richard Janes words to the effect that "we're going to teach her a lesson".

156. Robert Smaldone stated to me "what are you going to do now, call Obama?"

157. I continued to intermittently yell for help and I stated to Robert Smaldone "Son, you better be recording all this…".

158. The ambulance began moving but then came to a stop within a few minutes.

159. After the ambulance stopped Daniel Monahan started removing the body straps from across my legs, and pulling my jeans downwards.

160. I saw Wilton Ambulance EMT Richard Janes at my right side within the patient area. I saw Richard Janes holding a syringe with a needle in his hand.

161. At the same time, Richard Janes was pulling my handcuffed arms upwards and over my head.

162. Immediately after I saw the syringe and needle in Richard Janes' hand I felt the needle stick into the medial aspect of my right upper arm when Richard Janes injected me with an unknown substance.

163. Richard Janes stuck the needle into the medial aspect of my right arm through the sleeve of the shirt that I was wearing, causing the sleeve of the shirt to partially tear.

164. While this injection was being administered by Richard Janes, Robert Smaldone was covering up my face, and pushing his body over my face and torso.

165. At the same time Wilton Ambulance EMT Daniel Monahan pulled down my lower clothing (jeans and underclothes) and was

sexually assaulting me by inserting his fingers and/or hand into my genitalia and perineal area.

166. Shortly after being injected with the unknown substance by Richard Janes, I became extremely dizzy and lost consciousness.

167. I have no memory of any of the other events within the ambulance until I regained consciousness.

168. I regained consciousness when the ambulance reached the Norwalk Hospital Emergency Department (ER) and the stretcher was being removed from the ambulance.

169. Upon regaining consciousness I immediately called for help.

170. In the ER I saw Robert Smaldone, Michael Tyler, Daniel Monahan and Richard Janes standing close to the ER bed that I was on.

171. When I was in the ER bay, I repeatedly informed various hospital personnel that Robert Smaldone, Michael Tyler, Daniel Monahan and Richard Janes had physically and sexually assaulted.

172. In the ER I repeatedly told the nurse and other hospital personnel not to permit them to touch me because they, Robert Smaldone, Michael Tyler, Daniel Monahan and Richard Janes had sexually and physically assaulted me in the ambulance.

173. I informed the nurses and hospital personnel that my lower clothing, including the jeans and underwear, were partially

displaced downward off my body, with the zipper and the waist-band button being undone.

174. On April 29, 2015 prior to and during the incident I was wearing a black and red tunic top, denim jeans, underclothes, slippers, and eyeglasses with a black frame.

175. At no time prior to or during the April 29, 2015 incident was I wearing a sweatshirt, jacket or any other outerwear.

176. In the ER I heard Daniel Monahan and Robert Smaldone talking to a person who they addressed as "Chris".

177. In the ER I heard Daniel Monahan state to "Chris" "draw a blood tox., we'll bring it".

178. "Chris" drew blood samples from a vein on the dorsum of my right hand.

179. I saw "Chris" hand the tube, with the contained blood that was drawn from me, to Daniel Monahan.

180. I was sedated in the ER and remained in a semi-conscious or unconscious state for approximately three hours.

181. In the ER I spoke with a male physician, over the phone, after being instructed to do so by a female ER personnel. Due to my partially-sedated state, I have no memory of the substance of that conversation, nor did I know, at that time, the name of the person who I was speaking to.

182. I saw my husband in the ER and I told him that the Wilton Police and EMTs had assaulted me.

183. Immediately after I told him about being assaulted, my husband walked over to the nurses' station to obtain information from the nurse(s) about the assault.

184. Within a few minutes of my husband questioning the nurses, I was presented with discharge papers which the nurse asked me to sign and then I was discharged home, while I was still partly sedated.

185. On April 29, 2015 the only alcoholic beverage present in my home was exactly 7 ounces of a 6% alcohol content cooking red wine.

186. On April 29, 2015 between 12:00 PM and 1:00 PM I consumed exactly 2 ounces of this 6% alcohol content cooking wine.

187. At no other time on April 26, 2015 did I have access to any other alcoholic beverages nor did I consume any other alcoholic beverages.

188. On April 30, 2015, my nine year old child informed me that on April 29, 2015 she witnessed Robert Cipolla walking around and searching through cabinets and drawers in the kitchen, living areas and the upstairs bedroom areas our home.

189. On April 30, 2015, my nine year old child informed me that she witnessed Robert Cipolla take, and place into his pant pocket, a gold chain, locket and money, all of which were placed upon a metal plate in a room located on the second floor of my home.

26

190. The gold chain, locket and money taken from my home by Robert Cipolla belonged to me and my family.

191. After April 30, 2015 I was evaluated and treated for concussion and injuries to the right clavicle, arm and shoulder.

192. On May 25, 2015, through my attorney Mark Sherman, the Wilton Police Department received my written notice to preserve and retain all audio and video recordings and all documents and information related to the incident on April 29, 2015.

193. On May 29, 2015 Robert Cipolla and Robert Smaldone submitted a warrant for my arrest to the State's Attorney located at Belden Hill Ave, Norwalk CT.

194. On June 7, 2015 I turned myself in and submitted to arrest pursuant to the arrest warrant by appearing voluntarily at the Wilton Police Department, accompanied by my attorney Mark Sherman, who was instructed to remain in the waiting area.

195. On June 7, 2015, I was taken, unaccompanied, to the secure booking and fingerprinting area of the Wilton Police Department by two Wilton Police officers Shawn Frendt and Joseph Calorossi.

196. Within the booking and fingerprinting area, the Wilton Police officers Shawn Frendt and Joseph Calorossi placed me in an enclosed prisoner area.

197. Within the booking and fingerprinting area, Shawn Frendt and Joseph Calorossi asked me various questions related to my personal demographic and identifying information, all of which I answered.

198. Joseph Calorossi then took the bond money in the amount of $2500 from me and started counting it. While counting the money, Calorossi questioned me about where I had got the money from and I answered "the bank".

199. During this time Shawn Frendt instructed Joseph Calorossi to hold up one of his hands and display to me that a finger was missing from the hand.

200. Shawn Frendt then threateningly stated to me "ask him how that happened" and "it was shot off".

201. I was required to provide fingerprints by placing my fingers upon a computer screen.

202. While I was in the process of providing my fingerprints, Calorossi stepped immediately behind me and grabbed my hand under guise of assisting with the fingerprinting, pushed himself against me and stated "we can make this go away, I can talk to Cipolla and Smalls for you".

203. I felt extremely threatened by the statements and actions of Joseph Calorossi and Shawn Fendt on June 7, 2015.

204. Wilton Police officer Joseph Calorossi then handed to me a receipt for the bond money, a document of the arrest and a

28

handwritten note with a list of restaurants and his, Joseph Calorossi's, email address.

205. I asked my attorney Mark Sherman to ensure that the booking and fingerprinting videos of June 7, 2015 were preserved and made available to me as soon as possible.

206. Despite having received the notice to preserve all information on May 25, 2015, the Wilton Police Department has never provided the June 7, 2015 booking and fingerprinting audio and video.

207. On August 4, 2015 I was advised by Sergeant Tunney of the Wilton Police Department to submit a written complaint about the incident of 4-29-2015, addressed to the police chief Robert Crosby and to him, Sergeant Tunney.

208. On August 18, 2015 I mailed a written complaint about the incident of April 29, 2015 to the Wilton Police Chief, Robert Crosby and to Sergeant Tunney.

209. On August 29, 2015 I received a phone call from Sergeant Tunney who informed me that my written complaint dated August 18, 2015 had been received by him, Sergeant Tunney and Wilton Police Chief Robert Crosby, and that I would be contacted by the Wilton Police Department in the near future. I have attached a true and accurate copy of the August 18, 2015 complaint as EXHIBIT 35 to my opposition and response to the Defendants' Motion(s) for Summary Judgment.

210. Between August 29, 2015 and November 12, 2019 I received no further communication from the Wilton Police Department regarding my August 18, 2015 complaint, despite my repeated requests for information.

211. Between June 17, 2015 and May 10, 2017, a total of 34 hearings took place in the Norwalk Courthouse located at Belden Ave, Norwalk CT: I entered a plea of not-guilty to all charges, and demanded a jury trial on all counts. Except for one hearing on 10-13-2016, I appeared for all of the hearings that were timely scheduled and conducted.

212. Between May 27, 2016 and 9-26-2016, the prosecuting Deputy Assistant State's Attorney in the matter, Katherine E. Donoghue, approached me on multiple separate occasions, while I was self-represented, in the public areas of the Norwalk Courthouse, or outside the Norwalk Courthouse, regarding the pending charges against me.

213. During the times between May 27, 2016 and 9-26-2016, Katherine E. Donoghue engaged in conversations with me about the pending charges and told me that she would dispose of and seal the charges through a program that she described as the Accelerated Rehabilitation (AR) program, if I would agree to state that I was guilty of the crimes and misdemeanors I was charged with.

214. During the conversations with Deputy Assistant State's Attorney in the matter, Katherine E. Donoghue, I refused to enter or otherwise engage in the program that she described as "AR" or into any other plea agreement.

215. During each of these conversations I informed Katherine E. Donoghue that I would not agree to engage, or enter into the AR program or any kind of plea, because I did not want to falsely admit to committing the crimes and misdemeanors I was charged with in return for the benefit(s) provided by AR.

216. During these conversations I informed Katherine Donoghue that I wanted a jury trial of all the crimes and misdemeanors I was charged with.

217. On July 28, 2016, after a court hearing, Katherine E. Donoghue approached me immediately outside the Norwalk Court house at the rear exit steps area and engaged in a prolonged conversation with me. This in-person conversation was recorded.

218. I created the recording because I believed that Katherine Donoghue's urging me to admit to having committed the crimes and misdemeanors that I was falsely was charged with based upon Smaldone and Monahan's affidavits, in return for receiving the benefit of AR was improper and wrong and I was worried that she would misconstrue my discussions with her as an agreement to engage in AR.

219. During this conversation of 7-28-2016 I informed Katherine Donoghue that the false information was provided as a basis for my arrest warrant by Smaldone and Monahan "because it's a way for them to hide what they did. You know what they did…". Katherine Donoghue replied to me "....I know...you can file a civil lawsuit against them, because that's what I just want you to understand and I will work with you as best I can".

At a later time during this conversation I restated to Donoghue "... No... I got charges because they know what they did. They are doing this to cover up what they did. And I know that you're saying make a… …. make a complaint and there's going to be like oh ….accountability…..." In response to this Katherine Donoghue replied to me "No, what I'm saying is that this fighting the battle with your neck on the line isn't the way to win that war... battle, one thing. So I think you have a great opportunity available to you that I really, and I can't tell you what to do. I hope you take advantage of it because you could get them in a different way that….you know, talk to a civil attorney, see what you can file. And again, you know, statute of limitations start to run. So you might want to look into that sooner than later, civilly". Katherine Donoghue also stated to me "I just….I want you to do what is best for you. What you feel, which is understandable and right and, you know….I just don't want this to hurt you, I want to

32

shield you to the point.... where this if this hurts you and doesn't help. It doesn't help you if it hurts you...... here there's no ramifications to them for that what they did". I asked Donoghue "Just tell me is there any other avenue to complain against them?" Katherine Donoghue stated to me " You can file a complaint. Troop G is in Bridgeport. Troop G controls this jurisdiction. They would....you can let them know that your complaint is against a Wilton officer and I don't know if it's Wilton E.M.S. as well or whatever, but you can let them know. And obviously then you don't have that, you know, uphill battle with, you know, making a complaint against a Wilton police officer in the Wilton Police Department". Katherine Donoghue also repeatedly stated to me "there may be, like I said, a civil right ramifications there may be civil options though I'm not civil attorney. And again, I can't give you legal advice, but there are lawyers who do that type of work who are very, very good at it. So you may want to talk to them, but I'm kind of a broken record. I just want you not to put your head on the chopping block because there are other avenues".

220. I understood that Katherine Donoghue was attempting to protect me from a potential wrongful conviction because she knew that the charges against me were false, and had been

fabricated by the defendants to cover up their own criminal actions.

221. I provided this complete recorded conversation, which recording is a total of 53 (fifty three) minutes, to the defendants' attorneys in this matter.

222. I have attached a transcript of this recorded conversation, (which transcript was created using an audio to text conversion software, with minimal editing for clarity and to identify speakers) as EXHIBIT 10 to my opposition and response to the Defendants' Motion(s) for Summary Judgment. I swear and affirm that the transcript is a textual rendition of the audio recording of the 7-28-2016 conversation.

223. On 5-27-2016 Katherine Donoghue produced to me, in Court, a CD/DVD with the CD/DVD she stated contained all of the audio and video recordings which existed and which were produced to her by the Wilton Police Department.

224. On 6-10-2016 Katherine Donoghue stated in Court, and filed a document on the docket in the matter of State v. Pal "State's Response to the Defendant's Request and Motion for Disclosure", which document is stamped as "Superior Court Norwalk GA 20, Norwalk, 2016 Jun 10 PM 12:45, Norwalk". This Document states that: "(Wilton Police) Officer Godfrey confirmed that the DVD the undersigned gave to Dr. Pal

contained <u>ALL</u> of the video, audio, and/or electronic evidence that exists in this case. Specifically the DVD contained:

- Three (3) Dash Camera Videos from April 29, 2015.

- Audio recordings from five (5) phone calls made by the defendant to the main phone line of the Wilton Police Department on April 29, 2015.

- Audio recordings from six (6) 911 calls made by the defendant to the Wilton Police Department on April 29, 2015.

- Audio recording from one (1) return phone call made by Sgt. Cipolla to the defendant on April 29, 2015."

A true, and accurate copy of this document filed by Katherine Donoghue in Norwalk GA 20 on 6-10-2016 is attached as <u>EXHIBIT 31</u> to my opposition and response to Defendants' Motions for Summary Judgment.

225. The police car dash camera recordings produced by the State on 6-10-2016 were identified on the CD/DVD as 15-4332 Car 8, 15-4332 Car 12 and 15-4332 Car 12(2).

226. I utilized an audio to text conversion software (with minimal editing for clarity and to identify speakers) to convert the audio portions of the 15-4332 Car 8 recording to a text format which I have attached as <u>EXHIBIT 12</u> to my opposition and response to the Defendants' Motion(s) for Summary Judgment. I swear and affirm that the transcript is a

textual rendition of the audio recording of the 15-4332 Car 8 recording produced to me by the State on 5-27-2016.

227. I utilized an audio to text conversion software (with minimal editing for clarity and to identify speakers) to convert the audio portions of the 15-4332 Car 12 recording to a text format which I have attached as EXHIBIT 13 to my opposition and response to the Defendants' Motion(s) for Summary Judgment. I swear and affirm that the transcript is a textual rendition of the audio recording of the 15-4332 Car 12 recording produced to me by the State on 5-27-2016.

228. I utilized an audio to text conversion software (with minimal editing for clarity and to identify speakers) to convert the audio portions of the 15-4332 Car 12(2) recording to a text format which I have attached as EXHIBIT 14 to my opposition and response to the Defendants' Motion(s) for Summary Judgment. I swear and affirm that the transcript is a textual rendition of the audio recording of the 15-4332 Car 12(2) recording produced to me by the State on 5-27-2016.

229. On 9-26-2016 Katherine Donoghue approached me in-person again and stated to me the following: "put this behind you, do the AR...for your own safety". I asked her what she meant, Katherine Donoghue stated to me "these guys, you known the alleged victims in this, they made some statements that I worry" and "I am so sorry, they are forcing this to keep

going... you really should sue them, remember what I told you
about losing time, talk to an attorney, I can give you some
names....I can't even imagine how you are dealing…". I started
walking away from her; she followed me and stated to me "you
are right, they have been trying to cover….didn't give us all
of the recordings, the one from your fingerprint, that one
must be bad, I am so sorry...let's talk later… also don't
worry, they arrested the guy who may have been doing this,
Garner, you had said something about that…..he is going to be
in prison for a long time" and "just think about the AR, I'll
make it work". I once again refused and I informed her that we
should go ahead with the competency examination and a trial.

230. On 9-26-2016 I personally conducted an internet search
regarding "Garner home invasion Connecticut" and I personally
read multiple newspaper reports that stated that a man called
Dylan Garner had been arrested for committing a home invasion
and theft on 6-5-2015. The home invasion and theft occurred at
a home located approximately 15 minutes driving distance from
my home in Wilton.

231. I have attached two newspaper reports of Dylan Garner's of
arrest and crimes he had allegedly committed as EXHIBIT 17.

232. On 9-26-2016 I did personally conduct a docket search on
the Connecticut Judicial website, and found Docket No. CR15-

0140435 that a person named Dylan Garner, birth year 1973, was arrested and charged with Home Invasion.

233. On 11-10-2016 the Court ordered that I undergo a competency evaluation to determine if I was competent to stand trial.

234. Between 11-10-2016 I contacted the personnel, both via telephone and email, at the Bridgeport area where court ordered competency evaluations were conducted. I was informed via email by the supervisor, Michael Genovese, that the court ordered competency evaluations were in a state of back-log and that I had to await receipt of a notification for the date, time and location of the scheduled examination via mail. I have attached a true and accurate copy of that email chain as EXHIBIT 27 to my opposition and response to the Defendants' Motion(s) for Summary Judgment.

235. I underwent the competency evaluation at the scheduled date and time as provided to me via the official scheduling letter from the Bridgeport DMHAS, and I was accompanied by my attorney Jon Schoenhorn for this evaluation.

236. I notified the Court via motion, and I was out of the country during January and February 2017, to tend to my parent who was critically ill, and to attend to the subsequent final rites and funeral.

237. A court hearing was scheduled in the matter for March 13, 2017, but then without any notice to me was rescheduled and preponed to March 6, 2017.

238. Having received no advance notice of this March 6, 2017 hearing, I failed to appear for the hearing.

239. I communicated with the State Attorney's office via email and telephone to inform them of this.

240. Despite this I was automatically charged with a failure to appear, subject to a non-surety bond.

241. I voluntarily submitted to my arrest for the failure to appear charge by appearing at the Wilton Police department on March 20, 2017, accompanied by my attorney Katherine Mallach.

242. Prior to going to the Wilton Police department on March 20, 2017, my attorney Katherine Mallach and Jon Schoenhorn extensively communicated with the Wilton Police Chief John Lynch regarding the non-surety bond and the request for the presence of a female police officer during the conduct of the booking and fingerprinting.

243. On March 20, 2017 Robert Cipolla, Scott Sear and Mark Canepari were present at the Wilton Police department waiting area.

244. On March 20, 2017, despite being aware of the non-surety bond, Robert Cipolla immediately insisted that I give to him

$5000 in cash for the bond, and that I would not be permitted to leave unless I did so.

245. I refused to give Robert Cipolla the $5000 that he demanded and stated that I would not agree to be processed or fingerprinted until the issue was fully resolved.

246. I sat down in the waiting area.

247. Attorney Kathryn Mallach, who was accompanying me, engaged in a telephone call and informed the judge and/or the state's attorney of Robert Cipolla's demand for cash in the amount of $5000.

248. Robert Cipolla then engaged in a telephone conversation with the state's attorney, at which time he was instructed that he was not to obtain or attempt to obtain any money from me in return for a non-surety bond.

249. While these telephone conversations were occurring, Scott Sear stood threateningly close to me and stood blocking the door way while Mark Canepari was holding in his hand a Taser which was handed to him by another Wilton Police Officer who walked through the area.

250. During this entire time, I and attorney Kathryn Mallach were seated or standing, not posing any threat to anyone.

251. I was subsequently fingerprinted in the separate booking area by Scott Sear who was accompanied by Mark Canepari.

252. During the time of the fingerprinting and booking Mark Canepari either brandished the Taser towards me or held his hand directly over the Taser as a gesture of readiness to draw the Taser.

253. During this entire time at the Wilton Police Department building on 3-20-2017, I felt threatened and in extreme danger due to the presence of Robert Cipolla who had been the person who had instigated the 4-29-2015 incident, committed theft of money and jewelry from my home, and against whom I had filed a written complaint on August 18, 2015. To ensure my personal safety, I recorded the entire episode on my cellphone which I was holding in my hand or visibly placing into or on top of my outerwear. I provided this recording to my attorney at a later date.

254. On May 10, 2017, the State's Attorney spontaneously, and without any plea, agreement or consideration by me, withdrew all criminal and misdemeanor charges against me.

255. The State's Attorney entered a single long form substitute information charging me with the civil infraction of creating a risk of creating a public disturbance which is attached as EXHIBIT 33 to my opposition/response to Defendants' Motion(s) for Summary Judgment.

256. On May 10, 2017 Katherine Donoghue produced to my attorney Jon Schoenhorn, in Court, a document in the matter of State v.

Pal which document is titled "State's Response to Defendant's Supplemental Motion for Discovery", which included four photographs of the Wilton Ambulance-2692 in which I was forcibly imprisoned and assaulted on 4-29-2015. I have a attached a true and accurate copy of this document of 5-10-2017, and the photographs as EXHIBIT 32 to my opposition and response to the Defendants' Motion(s) for Summary Judgment.

257. At no time after May 10, 2017 did Katherine Donoghue or the State Attorney's Office produce any other information, documents or audio/video recording to me or to my attorney.

258. A bench trial was conducted on the infraction charge on June 13-14, 2017.

259. During the bench trial of infraction charge, the State stipulated, and the Court acknowledged and accepted that the only charge that that I was being tried for was based upon my conduct between 2:00 PM through 2:45 PM in the driveway of my home and was set forth in the Long Form Information dated May 10, 2017, which is attached as EXHIBIT 33.

260. Wilton Police defendants Smaldone, Cipolla and Tyler appeared and testified.

261. I was advised by my attorney not to testify.

262. My attorney Jon Schoenhorn stated, on the record, a narrow stipulation to admit the report of a calculation, performed on 5-5-2017, of a BAC (blood alcohol level) which utilized a

formula to convert the reported serum alcohol level from a medical record of 4-29-2015. I have attached a true and accurate copy of that Connecticut State Laboratory report as EXHIBIT 30 to my opposition and response to the Defendants' Motion(s) for Summary Judgment.

263. At no time did I, or my attorney, stipulate that the blood sample upon which the serum alcohol test was conducted at Norwalk Hospital on 4-29-2015, was indeed my uncontaminated and accurately preserved blood sample.

264. At no time was any evidence presented in the matter of State v. Pal, by the State that it was indeed my uncontaminated and accurately preserved blood sample that was the subject of this Connecticut State Laboratory report and recalculation of 5-5-2017.

265. On Jan, 16, 2020, I deposed Robert Cipolla, wherein Cipolla admitted that no subpoena or warrant had ever been obtained to preserve and/or establish the chain of custody of evidence of any blood samples drawn from me at the hospital on April 29, 2015.

266. On October 4, 2017 the Judge issued a ruling and judgment in State v. Pal finding me guilty of the infraction of creating a risk of creating a public disturbance in violation of CT GSA § 53a-181a(a)(3).

267. I timely appealed the finding of guilt for the charged infraction in the matter.

268. During the appeals process, Norwalk Court Clerk's office at Norwalk GA 20 was unable to locate or provide any copies of the CD/DVD used as an exhibit at trial, nor the other trial exhibits, and did not provide to me a signed statement of judgment file. As a result the appeal was rendered as not having been perfected.

269. Prior to the Wilton Police obtaining an arrest warrant based upon false information, and prior to my resultant arrest on June 7, 2015 I was, and continue to remain, a licensed physician in good standing, in the State of Connecticut.

270. Prior to the incident of April 29, 2015 and prior to the false charges and my resultant arrest on June 7, 2015 I was in the process of establishing an outpatient private general surgery practice in the Fairfield County area of Connecticut.

271. Between June 7 2015 and October 2017 my applications for professional liability insurance as a physician were rejected directly because of the false criminal charges pending against me.

272. Between June 7 2015 and October 2017, because I was unable to obtain professional liability insurance as a physician in the State of Connecticut, I was unable to commence and establish my medical practice in Fairfield County, CT.

273. Between June 7 2015 and October 2017, because of the false criminal charges, malicious abuse of process, malicious prosecution and false allegations made against me by the Wilton Police Defendants and the Wilton Ambulance defendants, I was unable to become gainfully employed in my profession.

274. Because of the false and malicious criminal complaint filed against me by Robert Smaldone and Daniel Monahan, I was forced to expend money in excess of $75,000 for legal representation.

275. I have suffered from, and continue to suffer, severe anxiety, depression and post-traumatic stress disorder as a direct result of the sexual and physical assault upon me by Daniel Monahan, Robert Smaldone, Michael Tyler, Robert Cipolla and Richard Janes, for which I have required treatment and will continue to require treatment in the future.

276. In April 2018 I filed a civil complaint and lawsuit in United States District Court of Connecticut, Case No. 3:18-cv-00616 (MPS).

277. Despite having received multiple discovery demands, notices to preserve evidence, the Wilton Police Defendants have never provided to me or any of my former attorneys, at any time, the following materials: voice recordings of the 4-29-2015 phone conversations between the Wilton Police Officers/Dispatchers and Debbie Lee; the 4-29-2015 phone conversations between the

Wilton Police officers/dispatchers and Asma Ahmad; and, my June 7, 2015 arrest video and audio recordings.

278. At no time did Defendants provide to me the DVD/CDs identified as Defendants Exhibits E, G and I appended to their Motion for Summary Judgment.

279. I have not received all of the materials that defendants have cited as exhibits and based their motion for summary judgment upon.

280. On January 16, 2020 I conducted a deposition of Richard Janes and I witnessed him accurately and truthfully identify himself by his real name (transcript attached as EXHIBIT 6). As a result, I definitively and unequivocally identify Richard Janes as the Wilton Ambulance EMT who injected my right arm with an unknown substance while I was imprisoned within the ambulance on 4-29-2015.

281. I definitively and unequivocally identify Daniel Monahan as Wilton Ambulance EMT who sexually assaulted, by pulling down my clothing and inserting his hands and fingers into my genitalia and perineal area while I was imprisoned within the ambulance on 4-29-2015.

282. I definitively and unequivocally identify Robert Smaldone and Richard Janes as the persons who forcefully restrained me and assisted Daniel Monahan in the sexual assault upon me on 4-29-2015.

I swear the forgoing to be true based upon my personal knowledge, and I sign this document under the penalty of perjury, this 27th day of April, 2020.

Signature: _____

Name: _NEELu PAL_____

Sworn to and subscribed before me on the

_____27_____ day of _April_____, 2020.

Notary Public

Seal/Stamp

James M. Bryson Jr.
Notary Public
State of Connecticut
Fairfield County

My Commission Expires May 31, 2024