# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

NEELU PAL,
    *Plaintiff*,

    v.

ROBERT CIPOLLA, et al.,
    *Defendants*.

No. 3:18cv616 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

Neelu Pal brings this action against the Town of Wilton, Wilton police officers Robert Cipolla, Robert Smaldone, Michael Tyler, and Scott Sear; and Wilton Ambulance employees Daniel Monahan and Richard Janes.[1]  ECF No. 49.  She alleges deprivation of civil rights under 42 U.S.C. § 1983 (count one); excessive force under 42 U.S.C. § 1983 (count two); unlawful search under 42 U.S.C. § 1983 (count three); malicious prosecution under 42 U.S.C. § 1983 (count four); malicious abuse of process under 42 U.S.C. § 1983 (count five); conspiracy to violate civil rights (count seven); assault and battery (count eight); negligent infliction of emotional distress (count nine); intentional infliction of emotional distress (count ten); theft and larceny (count eleven); and negligence (count twelve).[2]  *Id.*  The Town of Wilton and police officers Cipolla, Smaldone, Tyler, and Sear (collectively "Defendants") move for summary judgment as to all counts.  ECF No. 152.  For the reasons discussed below, the motion is GRANTED IN PART and DENIED IN PART.  I address in a separate ruling issued today the motion for summary judgment filed by the defendant Wilton Ambulance employees.  ECF No. 147.

---

[1] The operative complaint, ECF No. 49, was drafted by counsel, who represented Pal until he withdrew in April 2019.  ECF No. 65.  Since that time, Pal has been self-represented.

[2] The Court previously dismissed the *Monell* claim as to the Town (count 6).  See ECF No. 79.

I.     FACTS

The following facts, which are taken from the parties' Local Rule 56(a) statements and supporting exhibits, are undisputed unless otherwise indicated.[3]

Pal was a resident of Wilton.  ECF No. 177-2 at 44.  Her four year old son attended preschool at the Goddard School in Wilton.  ECF No. 177-2 at 22-23, 28.  Pal told Debbie Lee, the school's owner, that she was concerned that people, including Lee's husband, were observing children while they were in the bathroom and taking photographs.  ECF No. 177-2 at 31.

Asma Ahmad was a teacher at the school.  ECF No. 177-2 at 8, 25.  Pal saw Ahmad almost every day when Pal would drop off and pick up her son.  *Id.*  On April 28, 2015, Pal emailed Lee that Ahmad was upset at Lee and was repeatedly texting and emailing Pal about it.  ECF No. 177-2 at 30, 35-36.

At 11:28 a.m. on April 29, 2015, Lee called the Wilton Police Department regarding Ahmad.  ECF No. 153-5 at 6.  Lee explained that Ahmad was no longer employed at the school but was contacting parents.  *Id.*  She said that a parent (referring to Pal) had contacted her and had said that Ahmad had told Pal to meet Ahmad at the school to "witness" something.  ECF No. 153-

---

[3] The defendants argue that the Court should disregard Pal's affidavit, ECF No. 177-1, because it "violat[es] the sham affidavit doctrine."  ECF No. 183 at 3-4.  Under the sham-affidavit rule, "a party's factual assertion in an affidavit opposing summary judgment, contradicting h[er] prior deposition testimony, may be disregarded as a sham attempt to create an issue of fact."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 481 (2d Cir. 2014).  "For the rule to apply, the contradiction must 'be real, unequivocal, and inescapable.'" *FloodBreak, LLC v. Art Metal Indus., LLC*, No. 3:18CV503(SRU), 2020 WL 6060974, at *11 (D. Conn. Oct. 13, 2020) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F. 3d 11, 22–23 (2d Cir. 2014)).  The defendants, however, do not identify any specific averments that contradict Pal's deposition testimony.  Accordingly, I deny their request.  *See Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 309–10 (E.D.N.Y. 2013) (denying request to exclude affidavit from consideration on the basis of sham affidavit principle where moving party made conclusory claims and failed to "show how the declarations are inconsistent with deposition testimony"), *aff'd*, 578 Fed. App'x 51 (2d Cir. 2014).

5 at 7-8.  Lee further stated that Pal thought Ahmad "might even be outside her house."  ECF No. 153-5 at 6.  Dispatcher Galpin instructed Lee to tell parents not to have any contact with Ahmad and not to meet her.  ECF No. 153-5 at 10.  The dispatcher placed Lee on hold.  ECF No. 153-5 at 15.

<u>Pal Calls the Wilton Police Department</u>

While Lee was on the phone with Galpin, Pal called the main line of the Wilton police department.  ECF No. 153-5 at 16, 19.  She spoke to Officer Sisenstein and stated that "one of the preschool teachers has somehow quit or made some kind of threat against my child, I'm not quite sure what's going on."  ECF No. 153-5 at 19.  Pal stated that the teacher, Asma, lived in Stamford.  ECF No. 153-5 at 22.  Pal further stated "[a]nd this woman is telling me she wants to meet me in the parking lot of the Goddard School and she wants me to witness something.  And I'm -- I'm like sending this woman -- the person who is -- who is in charge of this Goddard School and this woman is not getting it. Like it's a little scary, you know . . . ."  ECF No. 153-5 at 22-23.  Sisenstein told Pal to hold on and placed the call on hold.  ECF No. 153-5 at 24.  The call then terminated.

At 11:36 a.m., Pal called 911.  ECF No. 153-5 at 26.  She told Dispatcher Galpin that she could not believe that she had been placed on hold and that she needed someone to come to her home.  ECF No. 153-5 at 26.  Galpin explained that Pal had been speaking to Officer Sisenstein, who had put the call on hold so he could discuss it with Galpin.  *Id.*  Pal responded that it was "rude" of Officer Sistenstein to put her on hold and that Galpin "need[ed] to understand this woman has been driving back and forth . . . in front of my property."  *Id.*  Galpin asked Pal to call back on the regular line and speak to Officer Sisenstein because 911 was only for emergencies.  *Id.*  Pal replied "no, I am not going to do that."  *Id.*  She asked "Who are the people who are involved in this?  This woman is driving back in front [sic] and forth . . . in front of my property."  ECF 153-

5 at 27. Galpin repeated that the 911 line was for emergencies and to "call back on a routine line. Please." ECF No. 153-5 at 27-28. When Pal declared "No, I will not," Galpin stated "You have to. I have to hang up, ma'am. I'm disconnecting the call." ECF No. 153-5 at 28.

Two minutes later, at 11:38 a.m., Pal called 911 again. ECF No. 153-5 at 30. She stated that she had "just spoke[n] to Officer Galpin who does not wish to speak with me." *Id.* Dispatcher Galpin gave her the telephone number of the main line of the police department and told her to call that number. *Id.* at 30-31. Pal responded that she had "'already called and they put me on this line." *Id.* at 31. Galpin explained he had not "put [her] on this line." *Id.*

When Galpin resumed the call with Lee, who had been on hold, Lee heard that Pal had called in on another line. ECF No. 153-5 at 15. Lee asked whether Pal was filing a report and Galpin responded that Pal was "harassing us. She's calling – the officer was speaking with her on another line, so he put her on hold and she starts calling us on 911 . . . I said, ma'am I have to disconnect this call for emergencies. And now she just called back." *Id.* at 16. He concluded the conversation by telling Lee that an officer would go to the school to speak to her. *Id.* at 17.

At 11:39 a.m., Pal called the main line and spoke to Sisenstein. *Id.* at 33. He explained he had placed her on hold to discuss the case with Galpin who was on the phone "with somebody else about the exact same case." *Id.* at 36. Pal told him that Ahmad had asked her to meet Ahmad at the school. *Id.* at 36-37. Pal further stated that Lee was not properly responding to the situation. *Id.* at 38 ("Debbie said she would contact me. I'm not going to send my kid to school until . . . . Debbie is in the clear about this thing. . . And she's not.") Pal went on to say that "I'm so scared and afraid about this woman because I – I may be wrong, but here's what I think, is someone who looks like Asma is, like, driving back and forth in front of my property and I'm not okay with that."

*Id.* at 39. Sisenstein told Pal that an officer was on his way to the school to speak to Lee. *Id.* at 41. Pal responded "Okay" and the call ended. *Id.* at 42.

In an 11:43 a.m. call, Galpin informed Cipolla that Lee had reported an issue with a former employee contacting parents. *Id.* at 44. Galpin further stated that the former employee had told a parent to meet her at the school to see something. ECF No. 153-5 at 44. Galpin said that while he was on the phone with Lee, a woman (Pal) had called in and spoke to Sistenstein, that Sistenstein put the call on hold to speak to Galpin about it, and instead of holding, the woman called 911. *Id.* at 46. Galpin explained that when he answered the 911 call, he told the caller that he was speaking to Sisenstein about the issue and that she should hang up but that she refused and instead called 911 again. *Id.* Galpin remarked to Cipolla, "I'm like, oh-ho, man, someone is looking to get pinched over here." *Id.* at 47.

<u>Officer Smaldone Investigates</u>

Officers Smaldone and Cipolla went to the Goddard School to investigate Lee's report. ECF No. 153-1. Lee told them she had been in contact with a parent, Pal, who was concerned because Ahmad had called her several times about a dispute Ahmad was having with Lee and Ahmad had requested that Pal meet her at the school to "witness something." ECF No. 152-2 at ¶¶ 4-5; ECF No. 175-1 at ¶¶ 4-5. After meeting with Lee, Smaldone proceeded to Pal's residence to continue his investigation and look into Pal's report that a vehicle, which may have been Ahmad's, had repeatedly driven by Pal's residence. ECF No. 152-2 at ¶ 10; ECF No. 175-1 at ¶ 10.

According to Smaldone's report, he checked the area and could not substantiate Pal's claim that a vehicle was repeatedly driving by her home. ECF No. 153 at 3. He reviewed the messages between Pal and Ahmad, which he described as "good-natured," and although there were messages

regarding a conflict between Ahmad and Lee, there was nothing "that could be considered harassment or threatening." ECF No. 153 at 3. He assured Pal that he would speak to Ahmad and advise her not to contact Pal anymore. ECF No. 153 at 4.

Pal has a different version. She testified that she "started telling [Smaldone] about what was going on" but he was "dismissive" of her concerns and did not look at the text messages. ECF No. 177-2 at 50 ("he was so dismissive. He wouldn't even listen. He wouldn't look at the phone. He wouldn't hear anything out. As soon as I mentioned Debbie Lee's name, he became really defensive. His tone of voice and his attitude changed completely . . . ."); ECF No. 177-2 at 60; 177-1 at ¶ 42. According to Pal, Smaldone left without telling her what was going to happen next. ECF No. 177-2 at 50-51. Pal maintains that after Smaldone left her residence, she continued to see a vehicle driving past her house. ECF No. 177-2 at 91; 177-1 at ¶¶ 46-48.

At 1:16 p.m., Pal called 911 asking for the name of the officer who had come to her home. ECF No. 153-5 at 51. She asked Galpin, who answered the call, to spell the officer's name for her and thanked him. *Id.*

At 1:22 p.m., Smaldone called Ahmad. ECF No. 152-2 at ¶ 15; ECF No. 175-1 at ¶ 15; ECF No. 153-5 at 53. Ahmad explained that she had quit working for the Goddard School because of her "health issues" and because Lee had treated her poorly. ECF No. 153-5 at 59. She confirmed that after she quit her job, she had contacted Pal to discuss issues she was having with Lee. ECF No. 152-2 at ¶ 19; ECF No. 175-1 at ¶ 19. Ahmad explained that since leaving the school, she was working for a family whose children attended the school. ECF No. 153-5 at 60. She and Lee had a "big dispute" because Lee had yelled at her in front of the children she was caring for. *Id.* at 61. Ahmad asked if she could call Smaldone back from her house phone because her cell phone was almost out of charge. *Id.* at 62-63. When she called him back, Smaldone asked Ahmad about her

request to Pal to meet her at the school to witness something. *Id.* at 98. Ahmad responded that Lee

had yelled at her in front of the children she was watching and that she wanted Pal – with whom

she was friends - to come down and "just be there in case" Lee yelled at her again. *Id.* at 99-100,

103. Ahmad asked Smaldone if she had done anything wrong to which Smaldone responded that

her comment had been "a little misinterpreted." *Id.* at 102. Smaldone told Ahmad that Pal no

longer wished to communicate with her and that all communication should stop. ECF No. 152-2

at ¶ 20; ECF No. 175-1 at ¶ 20. Ahmad indicated that she understood Smaldone's directive. ECF

No. 152-2 at ¶ 21; ECF No. 175-1 at ¶ 21. Smaldone also told Ahmad that she was no longer

allowed at the Goddard School. ECF No. 152-2 at ¶ 22; ECF No. 175-1 at ¶ 22. Smaldone reported

that his conversation with Ahmad was amicable and he closed the case after speaking with her.

ECF No. 152-2 at ¶ 24; ECF No. 175-1 at ¶ 24.

At 1:27 p.m., Pal called Smaldone, expressing frustration with Lee's lack of response to

her emails and concern that Ahmad was driving past her home. ECF No. 153-5 at 65, 66. The

following exchange ensued:

> NEELU PAL: She's telling me she is not responsible for whatever . . . these people
> who are employed by her. Okay. I -- I don't know who she is.
> OFFICER SMALDONE: Debbie?
> NEELU PAL: Debbie Lee, yeah. You know, I -- as a person, I would like to believe
> who she is, but she's telling me that she is not getting any response from these
> people who are employed by her who are going to be contacting me who are going
> to be contacting other parents, who are going to be, like, staking out our homes.
> OFFICER SMALDONE: No one is going to be staking out your home.
> NEELU PAL: You know what, Officer Sm[aldone], here's the thing, who is this
> person? Okay. I do not want to find tomorrow who this person is.
> OFFICER SMALDONE: I just had a conversation with her
> NEELU PAL: Send it to me in writing. Send it to me in writing. She will not send
> it to me in writing.
> OFFICER SMALDONE: Send what to you in writing?
> NEELU PAL: She will not send me anything.
> OFFICER SMALDONE: What do you want sent to you?
> NEELU PAL: Are you going to be telling her what to send in writing?

OFFICER SMALDONE: I'm not – you don't need anything in writing from her as far as --

NEELU PAL: I do.

OFFICER SMALDONE: No, there's nothing that you need in writing. What I'm telling you is that --

NEELU PAL: She has a business and

OFFICER SMALDONE: What I'm telling you

NEELU PAL: -- and

OFFICER SMALDONE: Listen, please. What I'm telling you is that I spoke with Asma and she's been advised not to contact any more parents . . . .

NEELU PAL: And Debbie knows all of this. Okay? Debbie has to take a stake in all of this.

OFFICER SMALDONE: Okay. Well, you need -- if you would like something in writing, you could come down and get the police report. Okay?

NEELU PAL: Yeah.

OFFICER SMALDONE: Because Debbie is not going to give you anything in writing.

NEELU PAL: Excellent, because I certainly --

OFFICER SMALDONE: Okay?

NEELU PAL: -- asked Debbie give it to me in writing. One time coming down give it --

OFFICER SMALDONE: Well, don't start any more issues with Debbie. If you need the police report

NEELU PAL: Why, because Debbie was special?

OFFICER SMALDONE: What's that?

NEELU PAL: Why, because Debbie is special?

OFFICER SMALDONE: Debbie is not special, but I don't want there to be an issue between you and her now. I'm trying to dissolve these problems right now.

NEELU PAL: I will love to.

OFFICER SMALDONE: -- and we don't want to make it worse.

NEELU PAL: I will love to. But this woman needs to send it to me.

OFFICER SMALDONE: Send what to you?

NEELU PAL: She has to respond to some emails, okay? She's telling me, she's telling Asma or this woman who she's employed of why she cannot be employed she's telling me.

OFFICER SMALDONE: That's not really something she needs to send to you.

ECF No. 153-5 at 67-71. Pal protested that "Asma could be doing whatever she wants to do.[]"

*Id.* at 71. When Smaldone responded that Pal was not listening to him, she cursed at him and

demanded to speak to "the person who is in charge of you officers" because "this woman is, like,

staking out my house." *Id.* at 72. Smaldone told Pal that Ahmad was not at Pal's house and that

he had just talked to her "on the phone, she's in Stamford." *Id.* at 73. Pal responded, "I don't

frickin' give a shit" and reiterated her demand to speak to a supervisor. *Id*. at 73-74. Smaldone told her to "hold on" and the line disconnected. *Id.* at 75.

Pal Makes More Calls to the Wilton Police Department

At 1:37 p.m., Pal called asking to speak with a supervisor. *Id.* at 80. Cipolla responded that he was in charge. *Id*. Pal asked him to spell his name, which he did. *Id.* at 80-81. Pal stated that her child was enrolled in a school in Wilton and that the officer "who is dealing with that school, with my complaint against that school, is actually in conflict." *Id*. at 81. She further stated that "[Y]our person who came to my home and who I contacted thinks that, oh, that's all good and that's all okay and it's not a big deal because Debbie Lee is known to him. No, that is not okay." *Id*. at 81-82. Cipolla explained that the police had received a complaint both from the school and Pal and had gone to the school before going to Pal's house. *Id*. at 82. Pal asked Cipolla his name, again, and he gave it to her; she asked him to spell it again, which he did. *Id*. at 83. Pal stated that Ahmad was driving back and forth in front of her house. *Id*. at 84. Cipolla said that they had reached out to her. *Id*. Pal responded "I don't give a shit," to which Cipolla stated that if she was going to use profanity, he was going to terminate the call. *Id.* Pal said "That's a word in the Bible, my boy." *Id.* When Cipolla told Pal not to "talk to me like that," Pal responded "I will talk to you like that and you can take it where it goes." *Id*. Cipolla said he was going to hang up the phone to which Pal replied "be my guest." *Id*. at 84-85.

At 1:43 p.m., Pal called back asking to speak to Cipolla. *Id*. at 108. The call terminated.

At 1:46 p.m., Pal called 911. *Id*. at 110. She stated she had been on hold for Cipolla. Dispatcher Galpin explained that "this is an emergency line" and told her she should "call back on the other line." *Id*. at 110. Pal responded, "I will not." *Id*.

At 1:47 p.m., Pal called 911 again.  *Id.* at 112.  Galpin told Pal "you cannot call 911. You can only call us for emergencies" and told her to "call back on the routine line."  *Id.*  Pal asked for his name and said "this woman is driving in front of my house."  *Id.*  After Pal again asked for his name, Galpin terminated the call.  *Id.*

At 1:49 p.m., Cipolla called Pal.  *Id.* at 114.

> NEELU PAL: Who's this?
> SERGEANT CIPOLLA: This is Sergeant Cipolla at the Wilton Police Department.
> NEELU PAL: Bullshit. Okay, Sergeant Cipolla, what is this woman doing driving in front of my house?
> SERGEANT CIPOLLA: Ma'am, we were up -- she's at your house right now?
> NEELU PAL: You -- she is responsible. What is she doing? I don't know what she's doing with this woman who is in
> SERGEANT CIPOLLA: Is she at your house now, ma'am?
> NEELU PAL: No.
>                . . .
> SERGEANT CIPOLLA: We were up at your house.
> NEELU PAL: I know and I'm seeing her driving back and forth.
> SERGEANT CIPOLLA: What kind of car is she driving?
> NEELU PAL: She's driving like a -I am not so up with cars. But, you know, this is what I --
> SERGEANT CIPOLLA: What --
> NEELU PAL: -- this is what I drive.
> SERGEANT CIPOLLA: What color is it?
> NEELU PAL: I drive like – here here's what I'm going to tell you and it's similar to what I drive. She drives something that looks like my Honda, that is like gray'ish, silver CRV.
>     You know, I don't know who she is. And the only thing I can tell you, Sergeant Cipolla, is this woman, Debbie, is I don't know what she's doing here.
> SERGEANT CIPOLLA: Who -- who are you saying is driving by your house, Debbie or Asma?
> NEELU PAL: Asma –
> SERGEANT CIPOLLA: Okay.
> NEELU PAL: -- is the person I think. I don't think Debbie is going to be driving by my house, but it's Asma. But -- but Debbie is the person who needs to tell her to freakin' stop.

ECF No. 153-5 at 115-16.  Cipolla asked if he could contact Pal's husband.  Pal responded "No, you cannot, because I am not a [sic] fucking dependent upon him, okay, Sergeant fucking Cipolla? Because this -- this kind of crap really pushes me off the edge."  *Id.* at 116.  When Cipolla attempted

to explain why he wanted to speak to him, Pal stated, "Shut your fucking mouth. I am a person independent of my husband . . . . Fuck you. Okay? I'm telling you this woman is driving in front of my house . . . ." *Id*. at 117.  Cipolla said they would send someone out.  *Id*.  Pal stated "Do it" and later added, "Sergeant Cipolla, send it to me in writing. Because this woman is not sending it to me in writing and it's frickin' scary for me . . . ."  *Id*. at 117-18.

Minutes later, at 2:00 p.m., Pal called 911, stating "I -- I need to understand, I have called 911, I called the regular school district, the regular police department, I need to know who is going to show up at my place."  *Id*. at 123.  Galpin responded that an officer was going out to her house now.  *Id*.

<u>Officers Arrive at Pal's House</u>

Shortly after, Smaldone, Cipolla, and Tyler went to Pal's house and parked in the driveway in front of the house.[4]  ECF No. 156, Defs' Ex. G at 14:13:29.  They rang the doorbell.  ECF No. 177-2 at 123.  Pal stated in her affidavit that "through the open window," she heard Cipolla state "we'll make sure it is a medical issue."[5]  ECF No. 177-1 at ¶ 60.  She also averred that Tyler said, "and the religion, there was a religion complaint here."  ECF No. 177-1 at ¶ 61.  Pal and her 4 year old son were home, and she answered the door.  ECF No. 177-2 at 123.  The officers asked Pal to come out of the house.  Defs' Ex. G at 14:15:08.  Although some of the conversation is not audible, Pal stated at one point that "this woman is threatening me and my kids" and "you guys are not doing anything about it."  Defs' Ex. G at 14:15:44.  Pal asked the officers for their names and their cards.  ECF No. 177-2 at 124.  They refused to give their names and indicated that they did not

---

[4] Cipolla's and Smaldone's dashboard cameras were on and recorded part of the encounter. (ECF No. 156, Defs' Ex. G, I.)  Because of where the vehicles were parked, the interaction between Pal and the officers in the doorway was not visually recorded, although some audio is discernible.

[5] Defendants maintain that the statement was "let's make sure this is not a medical issue or something." ECF No. 183 at 5.

11

have cards to which Pal responded "I will be making a complaint because I am not about to put up with this bullshit.  I will be calling the freaking police department and making a complaint."  ECF No. 177-1 at ¶¶ 68, 70-72.

The defendants contend that after stating that this is "bullshit," Pal "went to retreat inside" her home at which point Cipolla "grasped [Pal's] upper arm and pulled her outside the residence and onto the front stoop."  No. 153-1 at 4; 154-8 at 28.  Cipolla maintained that he thought "that if she retreated into the residence, it would've created an officer safety issue."  ECF No. 154-8 at 28.

Pal does not agree.  She testified that she retreated and closed the door.  ECF No. 177-2 at 180) ("I did retreat inside the residence.· I didn't just make the move.· I actually retreated and closed the door.").  She told the officers to "get out of my house."  ECF No. 177-1 at ¶ 76; Defs' Ex. G at 14:16:31.  According to Pal's deposition testimony, Cipolla put his foot in, the door was pushed open, and the defendants entered.  ECF No. 177-2 at 125, 181 ("all three of them actually entered the home, pulled me out. . . . I had actually closed the door.··They pushed it open.· They entered the home.· They pulled me out. . . . I had already retreated into the residence.")  Pal testified that she was "hanging" on to "the banister of the steps" and the officers pulled her out.  ECF No. 177-2 at 125-26.  While being taken out of the house, her head and right side of her upper body were "slammed" against the door frame.[6]  ECF No. 177-1 at ¶ 80; ECF No. 177-2 at 166-67.  She testified that Tyler said, "Muslim bitch, say goodbye to your kid. You're not going to see him again."  ECF No. 177-2 at 127.  No such comment is audible in the dashcam recording, although, as noted, parts of the interaction are not audible.  Defs' Ex. G at 14:16:44 – 14:17:24.

It is undisputed that Cipolla told Pal she was under arrest because "you kept calling 911,

---

[6] Pal avers that as a result, she subsequently was treated for concussion and injuries to the right clavicle, arm and shoulder.  ECF No. 177-1 at ¶ 191.

we told you not to call 911." Defs' Ex. G at 14:16:36-38; ECF No. 177-1 at ¶ 78. The officers handcuffed Pal and walked her to Smaldone's cruiser. Defs' Ex. G at 14:18:41. Smaldone and Tyler told Cipolla that they smelled alcohol on Pal, ECF No. 152-at ¶ 37; ECF No. 175-1 at ¶ 37, and in the dashcam audio, the officers can be heard asking Pal if she has been drinking. Defs' Ex. G at 14:17:31. While in the cruiser, Pal was hysterical, screaming "help me" repeatedly and swearing at the officers. Defs' Ex. G *passim*. Pal averred in her affidavit that Smaldone called her a "brown bitch" and said he would tase her if she didn't shut up; again, no such comment is audible in the dashcam recording. ECF No. 177-2 at 129-30; Defs' Ex. G.

Pal was removed from the cruiser and Smaldone and Tyler conducted a pat-down. ECF No. 177-2 at 134; Defs' Ex. G at 14:18:41- 51. Pal testified that during the pat-down, Tyler grabbed her breasts. ECF No. 177-2 at 134; ECF No. 177-1 at ¶ 88. Neighbors gathered outside. ECF No. 177-1 at ¶ 84. While Pal was standing outside the cruiser, she repeatedly yelled "Help me, help my child." Defs' Ex. G at 14:18:43-58. Pal's son ran around the cruiser. Defs' Ex. G at 14:18:58; ECF No. 177-2 at 131. Pal testified that no one was watching him and she heard the officers converse with "a random stranger" that they were "looking for a place to leave this kid with while we take her away." ECF No. 177-2 at 132. After Pal was put back into the cruiser, she continued to scream. ECF No. 177-1 at ¶ 92; Defs' Ex. G at 14:21:18.

According to Cipolla, based on Pal's agitation, irrational behavior, and the odor of alcohol, he determined that Pal should undergo a psychiatric evaluation pursuant to an emergency examination request under Conn. Gen. Stat. § 17a-503. ECF No. 153-6 at ¶¶ 11-12; ECF No. 153-1 at 5. Smaldone completed a Police Emergency Examination Request Form, indicating that Pal was agitated, "appeared to be intoxicated," and had "made numerous 911 calls throughout day obsessing over the owner of her child's preschool. Paranoia about safety of her child." ECF No.

13

157-1 at 2. Wilton EMS was contacted to transport Pal to the hospital. ECF No. 153-6 at ¶ 13. At approximately 2:40 p.m., while Pal was in the back of the cruiser, her 9 year old daughter arrived home from school. ECF No. 177-1 at ¶ 127; Defs' Ex. G at 14:39:20. When the Wilton ambulance personnel – defendants Monahan and Janes - arrived, Pal was placed on a stretcher and put into the back of the ambulance. ECF No. 177-2 at 129.

The defendants contacted Pal's husband, who was in New York City but said he would return home immediately. ECF No. 152-2 at ¶ 60; ECF No. 175-1 at ¶ 60. Cipolla told Pal that he was going to get a female police officer, Diane McClean, to come and stay with the children. ECF No. 177-1 at ¶ 147.

Sisenstein called the Connecticut Department of Children and Families to report the incident. ECF No. 152-2 at ¶ 61; ECF No. 175-1 at ¶ 61. The matter was assigned to social worker Nereida Builes for investigation. ECF No. 152-2 at ¶ 62; ECF No. 175-1 at ¶ 62. A formal report of suspected child abuse/neglect was later prepared by Smaldone and provided to DCF. ECF No. 152-2 at ¶ 63; ECF No. 175-1 at ¶ 63. At the conclusion of her investigation, Ms. Builes substantiated a finding of physical neglect against Pal based on her conduct on April 29, 2015. ECF No. 152-2 at ¶ 70; ECF No. 175-1 at ¶ 70.

<u>Ambulance</u>

The parties dispute what occurred once Pal was in the ambulance. According to Smaldone, Pal swung her hands around and would not stay still. ECF No. 153-2 at 4. He and EMT Monahan tried to restrain her. *Id.*; ECF No. 153-12 at 4. Pal attempted to bite Smaldone and kicked EMT Monahan in the face. ECF No. 153-2 at 4; 153-9 at 2; ECF No. 153-12 at 4-5.

Pal denies this. ECF No. 177-2 at 144-45. Pal testified that Smaldone said to one or both of the EMTs "We're going to teach her a lesson." ECF No. 177-1 at ¶ 155; 177-2 at 142-43. Her

head was "slammed" against a metal box in the ambulance. ECF No. 177-2 at 278. She further testified that while in the ambulance, Smaldone held her down, EMT Janes injected "her right arm with an unknown substance," and EMT Monahan "pulled down [her] clothing" and inserted his fingers into her vagina. ECF No. 177-2 at 140, 142, 145; ECF No. 177-1 at ¶¶ 280-82.

Pal was taken to Norwalk Hospital's Emergency Department. ECF No. 152-2 at ¶ 47; ECF No. 175-2 at ¶ 47. Hospital records state that she was "screaming and accusing police officers of assaulting her," ECF No. 157-6 at 2, and "kicking at staff, writhing in gurney and trying to pull out of handcuffs." ECF No. 157-6 at 3. Pal avers that she told hospital staff that she had been sexually assaulted, ECF No. 177-1 at ¶¶ 171-72; ECF No. 177-2 at 147, although hospital records do not indicate a sexual assault. ECF 157-6 at 7. Pal's blood serum ethanol level was .181 milligrams per deciliter, which reflects a .15 blood alcohol level.[7] ECF No. 157-6 at 7. She was assessed as uncooperative, hostile, belligerent with delusional thoughts and judgment impaired by intoxication. ECF No. 157-6. Clinical impressions were "acute alcohol intoxication" and "emotional crisis, acute reaction to stress." ECF No. 157-6 at 7.

Meanwhile, Cipolla remained at Pal's house. ECF No. 153-1 at 5; 153-6 at ¶ 14. He was joined by Student Resource Officer Diane McLean. ECF No. 153-6 at ¶ 14; Defs' Ex. G at 14:52:34. Pal claims that Cipolla searched Pal's home and took money and jewelry. ECF No. 177-1 at ¶¶ 188-89. She offers the affidavit of her daughter who states she witnessed Cipolla going

---

[7] The toxicology report was admitted as a full exhibit in the underlying criminal trial. ECF No. 177-43 at 161. Nonetheless, Pal admits only to consuming "a small amount of alcohol," and denies that she was intoxicated. ECF No. 177-2 at 198-99; see ECF No. 177-2 at 201 (Q: "So do you deny the finding or diagnosis of acute alcohol intoxication? A. Yes.") She appears to dispute the authenticity of the blood sample and insinuates that the sample was somehow tampered with. Pal points to her affidavit in which she states that she heard Monahan and Smaldone speak with the nurse who drew Pal's blood and that the nurse gave the tube to Monahan. ECF No. 177-1 at ¶¶ 177-79, 263-64.

through closets and drawers and taking a gold necklace and cash and putting them in his pocket.[8] ECF No. 179-2. Cipolla denies conducting any search and denies the allegation that he stole anything. ECF No. 177-5 at 63. Upon the arrival of Pal's husband, Pal's children were released to his custody. ECF No. 152-2 at ¶ 69; ECF No. 175-1 at ¶ 69.

Warrant

On May 5, 2015, EMT Monahan gave a signed written statement to the Wilton Police Department in which he stated, among other things, that on the way to the hospital, Pal began kicking and screaming and kicked him in the face. ECF No. 153-9 at 2. On May 29, 2015, after conferring with Assistant State's Attorney Katherine Donoghue, Smaldone prepared a warrant application for Pal's arrest on charges of Misuse of the Emergency 911 System in violation of Conn. Gen. Stat. § 53a-180d; Risk of Injury to a Minor in violation of § 53-21(a); Assault on a Public Safety Officer/Health Care Personnel in violation of § 53a-167c[9]; and Criminal Attempt of an Assault on a Public Safety Officer/Health Care Personnel in violation of §§ 53a-49 and 53a-167c. ECF No. 152-2 at ¶ 73; ECF No. 175-1 at ¶ 73; ECF No. 153-12. Assistant State's Attorney Donoghue signed the warrant. ECF No. 152-2 at ¶ 74; ECF No. 175-1 at ¶ 74. On June 2, 2015, Connecticut Superior Judge Wenzel signed the warrant with the exception of the charge for Risk of Injury to a Minor, which was dismissed at that time. ECF No. 152-2 at ¶ 75; ECF No. 175-1 at ¶ 75.

---

[8] The defendants challenged Pal's submission of this evidence, see ECF No. 184, and sought to preclude it on the grounds that it was not timely disclosed. I disagree and deny the defendants' motion to preclude in a separate ruling issued today.

[9] Conn. Gen. Stat. § 53a-167c provides in pertinent part: "A person is guilty of assault of public safety, emergency medical, public transit or health care personnel when, with intent to prevent a reasonably identifiable peace officer, . . . employee of an emergency medical service organization . . . from performing his or her duties, and while such peace officer, . . . , employee, . . . health care employee . . . is acting in the performance of his or her duties, (1) such person causes physical injury to such [person] . . . ."

Pal asserts that Smaldone's and Monahan's statements (that she tried to kick Monahan and bite Smaldone) in the affidavit in support of the arrest warrant are false, ECF No. 177-2 at 144-45, 174, 175; ECF No. 177-1 at ¶ 274, and were made to "hide what they did." ECF No. 177-1 at ¶ 219. In August 2015, Pal sent a letter to the Wilton Police Chief complaining about the April 29 incident. ECF No. 177-52.

Between September 2, 2015 and October 4, 2017, there were more than 25 court hearings in Connecticut Superior Court in Pal's criminal case. ECF No. 152-2 at ¶ 76; ECF No. 175-1 at ¶ 76. Assistant State's Attorney Katherine Donoghue primarily appeared on behalf of the State. ECF No. 152-2 at ¶ 77; ECF No. 175-1 at ¶ 77.

On March 6, 2017, the Court ordered Pal rearrested for failure to appear. ECF No. 152-2 at ¶ 84; ECF No. 175-1 at ¶ 84. On March 16, 2017, Superior Court Judge Hernandez ordered Pal to appear for a competency evaluation on April 4, 2017 and to appear at the Wilton Police Department to surrender herself on the re-arrest for failure to appear. ECF No. 152-2 at ¶ 85; ECF No. 175-1 at ¶ 85. On March 20, 2017, Pal, accompanied by her attorney, surrendered herself to the Wilton police department. ECF No. 152-2 at ¶ 86; ECF No. 175-1 at ¶ 86. Cipolla, Sear, and another officer, Mark Canepari, were present. ECF No. 177-1 at ¶ 243. Pal audio recorded the interaction using her cell phone. ECF No. 152-2 at ¶ 87; ECF No. 175-1 at ¶ 87. According to Pal, despite being aware that the charge was subject to a non-surety bond, Cipolla insisted that Pal give him $5000 in cash for the bond and told her that she would not be able to leave until she did so. ECF No. 177-1 at ¶ 244. After Pal's attorney contacted the State's Attorney, Cipolla was instructed not to demand cash for the bond. ECF No. 177-1 at ¶¶ 247-48. Pal states in her affidavit that during these discussions, Sear stood "threateningly close" to her and "block[ed] the doorway." ECF No. 177-1 at ¶ 249.

Criminal Trial

On May 10, 2017, Assistant State's Attorney Donoghue stated on the record that she had not previously reviewed Pal's medical records from Norwalk Hospital "on the date in question and her treatment there that day. Based on my review of those records, I concluded that I had concerns proving specific elements of the defendant's specific intent[] to act with respect to certain conduct on the date in question."  ECF No. 154-7 at 3; ECF No. 152-2 at ¶ 90; ECF No. 175-1 at ¶ 90. Because of her concerns, she said that the state was going to file a long form substitute information charging Pal with a single count of Creating a Public Disturbance in violation of Conn. Gen. Stat. § 53a-181a(a)(3).[10]  ECF No. 154-7 at 3-4.  The information charged that on April 29, 2015 from approximately 2:00 – 2:45 p.m. in her driveway, Pal "recklessly created a risk of causing inconvenience, annoyance or alarm by making unreasonable noise" in violation of § 53a-181a(a)(3).  ECF No. 177-51. After a bench trial on June 13 and 14, 2017, Pal was found guilty on October 4, 2017.  ECF No. 152-2 at ¶¶ 91-92; ECF No. 175-1 at ¶¶ 91-92.

## II.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.,* 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the

---

[10] Conn. Gen. Stat. § 53a-181a provides in pertinent part:  "(a) A person is guilty of creating a public disturbance when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . .  makes unreasonable noise.
(b) Creating a public disturbance is an infraction."

18

light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### III.  DISCUSSION[11]

### A.  Count 1

#### 1. Illegal Entry

Count 1 of the complaint broadly alleges that Pal was deprived "of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, in violation [of 42] U.S.C. § 1983." ECF No. 49 at ¶ 94.  Pal alleges that Cipolla, Smaldone, and Tyler entered her home without a warrant in violation of the Fourth Amendment.  ECF No. 49 at ¶¶ 37-38, 55.  While the factual basis for a claim of illegal entry is clearly set forth in the complaint, there is no separate count alleging it as a legal claim.  However, because the defendants clearly are on notice of the

---

[11] The complaint fails to differentiate among the defendants, alleging instead violations by "the defendants."  As a preliminary matter, the defendants argue that Pal has not demonstrated that Sear was personally involved in any of the alleged conduct underlying the legal claims asserted in the complaint and that as a result, all claims against him fail.  See ECF No. 152-1 at 21 n.11.  See *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'")  Pal does not oppose the motion as to Sear and has presented no evidence that would sustain claims against him individually.  Accordingly, summary judgment is GRANTED as to all claims against Sear.

allegation and discuss the underlying factual allegations, ECF No. 152-1 at 5, 21, 40 n.16, the Court construes this Fourth Amendment claim as arising under Count 1.[12]

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting U.S. Const. amend. IV). "[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002) (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam)). *See also Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much" (citation omitted)); *Payton v. New York*, 445 U.S. 573, 590 (1980) ("the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

As noted, the parties dispute whether the defendants entered Pal's home, and the video footage submitted does not show a clear picture of what occurred at the front door. Cipolla maintains he was at the doorway of Pal's home when he grasped Pal's shoulders and pulled her to the front stoop. ECF No. 153-1 at 4; ECF No. 154-8 at 28; see ECF No. 177-43 at 138 (Smaldone's testimony that Cipolla was at the "threshold of the doorway" when he grabbed her upper arm.) He denies that the officers entered the house. ECF No. 177-43 at 96 ("We were not in her house.") Pal, however, testified that as she started to close the door, Cipolla "stepped inside" and that all three officers entered. ECF No. 177-2 at 125, 181. Viewing the disputed facts in the light most favorable to Pal, as I must at the summary judgment stage, I find that a genuine dispute of fact

---

[12] In their brief, the defendants discuss these facts under the heading "The Initial Detention and Search of the Plaintiff was Reasonable." ECF No. 152-1 at 18.

exists as to Pal's claim asserting an illegal entry into her house. I therefore deny summary judgment as to the illegal entry claim.[13]

### 2. False Arrest on April 29, 2015

Also within Count 1 is Pal's claim that the defendants arrested her on April 29, 2015 without probable cause in violation of the Fourth Amendment. ECF No. 49 at ¶¶ 34, 38, 43, 98. The defendants argue that they are entitled to summary judgment as to this claim because probable cause existed for Pal's arrest for the charge of misuse of the emergency 911 system in violation of

---

[13] In a footnote, the defendants suggest that they are entitled to qualified immunity on the ground that exigent circumstances applied, citing *Shakir v. Stankye*, 805 Fed. App'x 35 (2d Cir. 2020). See ECF No. 152-1 at 40 n.16. In *Shakir*, the defendant officers arrested the plaintiff at his home pursuant to an arrest warrant on charges that he sexually abused the daughter of a former girlfriend. Shakir refused to answer questions about the location of his son, A.S., who the defendants knew was not at school and who was supposed to be living with Shakir's mother pursuant to an agreement with the Connecticut Department of Children and Families pending further investigation into the sexual abuse charges against Shakir. Unable to locate A.S. or confirm his wellbeing, the officers entered Shakir's house, and found A.S. inside. The Court of Appeals concluded that the defendants' warrantless search did not violate any clearly established right because under the circumstances, the defendants could reasonably believe that A.S. was inside Shakir's home and in need of assistance, a sufficient basis to conduct a warrantless search. In so concluding, the Court noted that Shakir's refusal to provide A.S.'s location - along with his absence from school - supported the defendants' reasonable belief that A.S. was inside the home. In addition, although the defendants did not have affirmative evidence that Shakir had been sexually abusing or otherwise endangering A.S., they knew about the DCF agreement pursuant to which A.S. was living away from his father. In addition, the Court further found that regardless of whether Shakir had endangered A.S. prior to surrendering to police, Shakir could not have cared for A.S. following his arrest. In light of those facts, the Court of Appeals determined that the defendants were entitled to qualified immunity. By contrast, the facts of this case, as set forth in the summary judgment record, do not permit the conclusion that, as a matter of law, it was objectively reasonable for the officers to believe there were exigent circumstances. Under Pal's version of events, she told the officers she would be making a complaint and was closing the door from a position squarely inside her home when the officers, upon hearing that she would make a complaint, pushed the door open, entered her home, and pulled her out. ECF No. 177-1 ¶¶ 71-79; ECF No. 177-2 at 181. If the officers entered the home because she threatened to complain, rather than because they believed she posed a threat to officer safety, then they would obviously not have qualified immunity in the face of the illegal entry claim. Only a jury can decide whether Pal's version of events is true, and I thus cannot decide the qualified immunity issue on summary judgment.

Conn. Gen. Stat. § 53a-180(d) and alternatively, even if probable cause was lacking, they are entitled to qualified immunity because there was arguable probable cause for Pal's arrest. ECF No. 152-1 at 21, 40.

In order to establish a § 1983 false arrest claim based on the Fourth Amendment right to be free from unreasonable seizures, a plaintiff must show: "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent for the arrest; and (4) the arrest was not supported by probable cause." *Marchand v. Simonson*, 16 F. Supp. 3d 97, 109 (D. Conn. 2014) (citations omitted).

The existence of probable cause for an arrest "is a complete defense to an action for false arrest." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). Probable cause to arrest "exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotations, alteration, and citations omitted). "Moreover, probable cause turns on an objective analysis of information available to the arresting officer." *Warheit v. City of New York*, 271 Fed. App'x 123, 125 (2d Cir. 2008). *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Because the defendants also have asserted that they are entitled to qualified immunity on this claim, ECF No. 152-1 at 40-41, they "need only show 'arguable' probable cause" to defeat

the plaintiff's false arrest claim. *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997)). Arguable probable cause exists if either "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Lee,* 136 F.3d at 103 (quotation marks omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

Conn. Stat. Gen. § 53a-180d(a) provides "a person is guilty of misuse of the emergency 911 system when such person (1) dials or otherwise causes [the emergency 911 system] to be called for the purpose of making a false alarm or complaint, or (2) purposely reports false information which could result in the dispatch of emergency services."[14]

Even when the evidence is viewed in the light most favorable to the plaintiff and with all permissible inferences drawn in her favor, the defendants had at least arguable probable cause to arrest Pal for violating Conn. Gen. Stat. § 53a-180d. By the time Smaldone, Cipolla, and Tyler went to Pal's house at approximately 2:15 pm on April 29, Pal had called the Wilton Police Department 12 times, of which 6 calls were to 911: 11:36 a.m., 11:38 a.m., 1:16 p.m., 1:46 p.m., 1:47 p.m., and 2:00 p.m. ECF No. 153-5 at 26, 30, 51, 112, 123. She stated that Ahmad wanted to meet her at the school and expressed indignation that Lee was not responding to Pal's emails. She also reported that a vehicle, which she claimed was Ahmad's, was driving past her house. ECF No. 153-5 at 26, 30. In response to her calls, Smaldone spoke to Lee and went to Pal's home. ECF

---

[14] Neither party offers any caselaw interpreting § 53a-180d(a) and the Court's research reveals none on point.

No. 152-2 at ¶ 10; ECF No. 175-1 at ¶ 10. He reported that he did not see any vehicles driving by Pal's house and could not substantiate Pal's complaint. ECF No. 153 at 3. Although the parties dispute whether he reviewed the text messages between Pal and Ahmad, it is undisputed that Smaldone spoke to Ahmad, clarified the context of her request that Pal meet Ahmad in the school parking lot, and observed that Ahmad's comment has been misinterpreted. ECF No. 153-5 at 102; ECF No. 153-1 at 4; ECF. No. 152-2 at ¶ 15; ECF No. 175-1 at ¶ 15. Pal's complaints had been investigated, Smaldone reported that his conversation with Ahmad was amicable, and he closed the case after speaking with her. ECF No. 152-2 at ¶ 24; ECF No. 175-1 at ¶ 24. Possessed of this information, Smaldone assured Pal that he had spoken to Ahmad and Ahmad was not driving by Pal's house because, among other things, she was at her home in Stamford. ECF No. 153-5 at 73. Even after that conversation, Pal continued to call 911, ECF No. 153-5 at 110, 112, continuing to report that "this woman is driving in front of my house." *Id.* at 112. After being instructed by the 911 dispatcher to call the routine line, ECF No. 153-5 at 110, Pal dialed 911 twice more - at 1:47 pm and again at 2:00 pm. ECF No. 153-5 at 112; ECF No. 153-5 at 123. Under the "totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), the officers made an entirely reasonable inference that Pal's complaints were unfounded. On the record before the Court, it is at least clear that officers of reasonable competence could disagree on whether probable cause existed that Pal was making a false alarm or complaint or purposely reporting false information in violation of the statute.

### 3. *Illegal Seizure for involuntary medical examination*

Pal alleges that the defendants violated her Fourth Amendment right to be free from an unlawful seizure. ECF No. 49 at ¶ 98. It is not clear which alleged acts of the defendants she is referring to, but for the sake of thoroughness, I will construe her complaint to raise a Fourth

Amendment challenge to the officers' initiation of an emergency medical examination under Conn. Gen. Stat. § 17a-503(a). The defendants are entitled to summary judgment on this claim because the undisputed facts demonstrate that there were reasonable grounds for believing that Pal was a danger to herself or others.

"A warrantless seizure for purposes of involuntary hospitalization constitutes a seizure under the Fourth Amendment and may be done without a warrant only 'upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others.'" *Schofield v. Magrey*, No. 3:12CV544, 2015 WL 521418, at *3 (D. Conn. Feb. 9, 2015) (quoting *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003). The Fourth Amendment requires a "probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Waananen v. Barry*, 343 F. Supp. 2d 161, 170 (D. Conn. 2004) (internal quotation marks omitted).

Here, the undisputed evidence shows that the facts available to Cipolla at the time of his decision indicated probable cause to believe that Pal potentially posed a danger to herself or others. Pal had made repeated calls to the police reporting that someone from her son's preschool was driving by her house and insisted that the police come to her house. During these calls, she used profanity and frequently repeated herself, at one point asking Cipolla twice in the same conversation for his name and the spelling of his name. After investigating her claims, Officer Smaldone was unable to substantiate them. And when the three officers arrived at her house following her confirmed calls to 911, Pal was confrontational, demanding their names, threatening to file a complaint, and attempting to close the door. In addition to her erratic behavior, the officers detected a smell of alcohol on Pal; when the EMTs arrived, one of them similarly remarked that she appeared intoxicated. She became completely distraught when she was placed in the cruiser.

By her own description, Pal was "extremely distraught," "protest[ed] loudly," and screamed for help while in the cruiser. ECF No. 177-1 at ¶¶ 132-33; see ECF No. 177-2 at 184 (Pal testifying that she was screaming loudly and that "I started screaming help me, help my son.· And pretty much, that is the extent of what I was saying other than calling them the white boy and the fucking assholes, which I stand by"). If anything, the dashcam video and audio reveal that description to be an understatement. For approximately 30 minutes while in the back of the police cruiser and while being placed in the stretcher, Pal alternated between high-pitched screaming and calmer speech, but at all pitches her speech was laced with vulgarity at the officers and the EMTs. Pal has not adduced sufficient evidence to demonstrate a genuine dispute of material fact about whether defendants had reasonable cause to believe that she suffered from a psychiatric disability and was a danger to herself and others, including her small children. Accordingly, the defendants are entitled to summary judgment on any claim that they violated her Fourth Amendment right to be free from an unreasonable seizure.

### 4. First Amendment Retaliation

Pal alleges that she was arrested after she told the defendants that she would file a complaint. ECF No. 175 at 27. Specifically, she argues that the defendants' "act of arresting [her] as soon as she informed them that she would be making a complaint was an act of retaliation intended to inhibit Plaintiff from actually making a complaint." ECF No. 175 at 27. The defendants argue that they are entitled to summary judgment because probable cause is a complete defense to a claim of retaliatory arrest and there is no evidence that the defendants actually chilled her speech. ECF No. 152-1 at 15.

"A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment, (2) the defendant took an adverse action

against him, and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). "The existence of probable cause defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive." *Caravalho v. City of New York*, 732 Fed. App'x 18, 23 (2d Cir. 2018). *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.") Because I have concluded that the defendants had at least arguable probable cause to arrest Pal, her retaliatory arrest claim fails. Furthermore, Pal has not shown that her First Amendment rights were "actually chilled." *Curely v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (quoting *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978)). Pal concedes that she filed a complaint in August 2015 with the police department about the April 2015 encounter. ECF No. 177-52. *See Azeez v. City of New York*, No. 16CV342, 2018 WL 4017580, at *12 (E.D.N.Y. Aug. 22, 2018) (plaintiff's retaliation claim that he was issued a summons after he threatened to complain failed where the record indicated that plaintiff did file a complaint). I therefore grant the defendants' motion for summary judgment with respect to Pal's First Amendment claim.[15]

## B. Count 2: Excessive Force

Pal alleges that Cipolla, Smaldone, and Tyler used excessive force in effectuating her arrest on April 29, 2015. ECF No. 49 at ¶ 100. The defendants argue that they are entitled to summary judgment because the force used was reasonable. ECF No. 152-1 at 18.

The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Such force

---

[15] Count 1 also invokes the Fifth and Eighth Amendments, but nothing in the record suggests that either provision applies and Pal does not argue in her brief that either does. I therefore do not address them.

exceeds the constitutionally permissible degree if it is "objectively [un]reasonable in light of the facts and circumstances confronting the [officers making the arrest], without regard to their underlying intent or motivation." *Id.* Determining the "reasonableness" of a particular use of force "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (numerations added). The events "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "In sum, the 'standard' to be applied in determining whether 'the amount of force' used exceeded the amount that was 'necessary' in the particular circumstances is 'reasonableness at the moment.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (quoting *Graham*, 490 U.S. at 396-97).

As for the first *Graham* factor, the defendants arrested Pal for misuse of the emergency 911 system in violation of Conn. Gen. Stat. § 53a-180d, a Class B misdemeanor. The "severity of the crime at issue" therefore is slight. As to whether Pal posed an immediate threat to the safety of the officers or others, the defendants offer Cipolla's statement that if Pal were able to retreat into the residence, "it would've created an officer safety issue," ECF No. 154-8 at 28, and there is also evidence as noted that her apparently intoxicated condition made her a danger to herself or her child. The parties' conflicting accounts, however, demonstrate a genuine issue of material fact concerning the amount of force asserted against Pal. Cipolla asserts that he grabbed her "upper arm and pulled her outside." ECF No. 153-1 at 4. Pal meanwhile alleges that the defendants "dragged" her out of the house and that her head and right side of her upper body were slammed against the door frame, causing injury. ECF No. 177-1 at ¶ 81; 177-2 at 166-67. The video evidence does not definitively resolve this issue, because it does not provide a clear view of the

28

front door of the house, and the accompanying audio is also inconclusive on this point. See Defs'
Ex. G. Because there is a genuine issue of material fact regarding the amount of force used, I
cannot decide as a matter of law whether the use of force against Pal was reasonable. I must
therefore deny summary judgment.

The defendants maintain that they are entitled to qualified immunity. ECF No. 152-1 at
40. Their claim, however, is predicated on their version of events and, specifically, their contention
that they "use[d] limited force" in grasping Pal's arm and pulling her. ECF No. 152-1 at 40-41.
But when the evidence is viewed in the light most favorable to Pal, the record shows that the three
officers rushed into her home, and dragged her out while she clutched the bannister of the staircase,
causing her head and the right side of her upper body to be "slammed" against the door frame.
ECF No. 177-1 at ¶¶ 80-81; ECF No. 177-2 at 166-67. Under that set of facts, a reasonable jury
could find that the defendants violated Pal's clearly established constitutional rights. Because there
"remains a genuine factual dispute, the existence of qualified immunity cannot be determined until
the factual dispute is resolved." *Franco v. Gunsalus*, 972 F.3d 170, 174 (2d Cir. 2020).[16]

## C.     Count 3: Unlawful Search

Pal alleges that Smaldone and Tyler searched her "without any individualized reasonable
suspicion that [she] was concealing any weapons or contraband" and that as a result, she "was
subjected to an illegal and improper search." ECF No. 49 at ¶¶ 103-04. To the extent that Pal is
arguing that the defendants were not entitled to conduct a pat-down, which is all that is shown on
the video, Defs' Ex. G, that claim fails. "The search-incident-to-arrest doctrine is an exception to
the general requirement that an officer must obtain a judicial warrant supported by probable cause

---

[16] The complaint does not specify the cause of action encompassing the alleged sexual
assault. Because Pal does not address the sexual assault as a violation of her constitutional rights,
the court construes it under count 8, the assault claim.

before conducting a search." *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017). "[O]nce a police officer has probable cause to effect an arrest, he has the authority to conduct a search incident to it regardless of the nature of the offense." *Joyner v. City of Mount Vernon*, No. 09-CV-8982, 2011 WL 3296083, at *4 (S.D.N.Y. July 25, 2011) (citing *U.S. v. Robinson*, 414 U.S. 218, 224 (1973)); *see also U.S. v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (same). Thus, to the extent Pal is challenging any search or pat-down of her person, I grant summary judgment to defendants on that claim.

Pal also claims that Cipolla illegally searched her home after she was taken to the hospital. ECF No. 49 at ¶ 56; ECF No 177-2 at 157. Defendants argue that they are entitled to summary judgment because "the undisputed facts demonstrate that Captain Cipolla's conduct following plaintiff's removal from the scene was lawful under the community caretaking exception." ECF No. 152-1 at 26. Cipolla maintains he remained at the residence to watch the children until Pal's husband arrived and did not search plaintiff's house or remove any property from the residence. ECF No. 152-1 at 27. However, Pal has proffered sufficient evidence in support of her claim to show a genuine issue of material fact exists. ECF No. 179-2. Specifically, the affidavit of her daughter states that she "saw policeman [Cipolla] going into the bedroom and my mom's office and opening closets and drawers" and, later, "standing in the guest room," where "[h]e was taking my mom's gold necklace" and "money" and putting those items in his pocket.[17] ECF No. 179-2 at 1. As a result, summary judgment is denied on this aspect of Pal's Fourth Amendment illegal search claim as to Cipolla.[18]

---

[17] Although the daughter's affidavit was filed only in redacted form, it is clear what her averments are.

[18] Because there is no evidence that Smaldone or Tyler were involved in the alleged search, they are entitled to summary judgment on this claim.

### D.      Count 4: Malicious Prosecution under § 1983

Pal asserts a claim of malicious prosecution as to her prosecution on the charges of misuse of 911 in violation of § 53-180d, assault on safety personnel in violation of § 53a-167c and attempted assault on safety personnel in violation of § 53a-49 and § 53a-167c.  ECF No. 49 at ¶ 64.  She alleges Smaldone and EMT Monahan provided false information in support of the charges.[19]  ECF No. 175 at 5; ECF No. 49 at ¶ 63 (alleging that Smaldone and EMT Monahan "created affidavits that contained false statements and information[ ] to support a warrant" for her arrest and subsequent prosecution.)  Smaldone moves for summary judgment on the grounds that probable cause existed for the charges and in the alternative, Pal cannot show a favorable termination.

Under federal and Connecticut law, "a plaintiff asserting malicious prosecution must prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Silano v. Hammel*, No. 3:17CV1498(KAD), 2019 WL 1385092, at *5 (D. Conn. Mar. 27, 2019), *aff'd*, 809 Fed. App'x 57 (2d Cir. 2020). "Malice may be inferred from lack of probable cause." *Jackson v. Town of Bloomfield*, No. 3:12CV924(MPS), 2015 WL 1245850, at *11 (D. Conn. Mar. 18, 2015).

Smaldone first argues that Pal's malicious prosecution claim fails because probable cause existed to prosecute her for the charges.  ECF No. 152-1 at 28.  As with a false arrest claim, the existence of probable cause is a complete defense to a claim of malicious prosecution.  *Savino v.*

---

[19] Because there are no allegations concerning their involvement, summary judgment is granted as to Cipolla and Tyler on this count.

*City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "While probable cause is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each criminal charge underlying the malicious prosecution claim." *Burton v. Undercover Officer*, 671 Fed. App'x 4, 5 (2d Cir. 2016); *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) (requiring separate probable cause analysis for each prosecution charge).

A Superior Court judge reviewed Smaldone's warrant application and determined it was supported by probable cause. ECF No. 153-12. An arrest "authorized by a judicial officer upon a finding of probable cause carries a presumption of reasonableness." *Stonick v. Delvecchio*, 438 F. Supp. 3d 154, 162 (D. Conn. 2020). This "presumption can be defeated by showing that a defendant (1) 'knowingly and deliberately, or with a reckless disregard of the truth,' procured the warrant, (2) based on 'false statements or material omissions,' that (3) 'were necessary to the finding of probable cause.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (quoting *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)). "To determine whether errors in an affidavit were 'necessary' to the probable cause finding, we rely upon the 'corrected affidavit doctrine,' under which errors in the affidavit 'are not material if, after crossing out any allegedly false information and supplying any omitted facts, the 'corrected affidavit' would have supported a finding of probable cause." *Pines v. Bailey*, 563 Fed. App'x 814, 817 (2d Cir. 2014).

I have already determined that at least arguable probable cause existed for the misuse of 911 charge. Because Pal offers no evidence that Smaldone became aware of information after the arrest that would overcome the presumption of probable cause that attaches to a warrant with respect to this charge, he is entitled to summary judgment as to this aspect of Pal's Fourth Amendment claim.

But the charges of assault on a public safety officer/health care personnel in violation of § 53a-167c and criminal attempt of an assault on a public safety officer/health care personnel stand on a different footing. These charges were based on EMT Monahan's and Smaldone's statements that Pal struck Monahan and tried to bite Smaldone. These statements are clearly critical to the probable cause determination.[20] However, as noted above, Pal has introduced evidence contradicting these assertions. ECF No. 177-2 at 144-45, 174, 175; ECF No. 177-1 at ¶ 274.[21] If her version is true, there are critical differences between that version and what appears in the affidavit, which permits an inference of recklessness in Smaldone's preparation of the affidavit. The corrected affidavit – without the statements that Pal assaulted Monahan and attempted to assault Smaldone - would not provide even arguable probable cause to prosecute Pal for these charges. Therefore, Smaldone is not entitled to summary judgment on this ground.

Smaldone next argues that Pal's malicious prosecution claim fails because she cannot satisfy the element of favorable termination. ECF No. 152-1 at 32.

"[F]ederal law defines the elements of a § 1983 malicious prosecution claim . . . ." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018). "[W]here a dismissal in the interest of justice leaves the question of guilt or innocence unanswered[,] ... it cannot provide the favorable

---

[20] It is true that "[o]nce a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *Williams v. City of New York*, No. 02CV3693, 2003 WL 22434151, at *6 (S.D.N.Y. Oct. 23, 2003). However, in a situation as here "where a police officer is accused of providing false information to a prosecutor that influences a decision whether to prosecute, he may be held liable for malicious prosecution." *Virgil v. City of New York*, No. 17CV5100, 2019 WL 4736982, at *6 (E.D.N.Y. Sept. 27, 2019).

[21] Pal points to statements by State's Attorney Donoghue that Pal surreptiously recorded on her cellphone which she contends lend support to her argument that the underlying statements were false. ECF No. 177-8. The proffered statements are hearsay, however, and therefore the Court does not consider them. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.")

termination required as the basis for [that] claim." *Id.* at 28. Rather, the Court of Appeals has clarified that "a plaintiff asserting a malicious prosecution claim under § 1983 must . . . show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Id.* at 22. "The answer to whether termination is indicative of innocence depends on the nature and circumstances of the termination; the dispositive inquiry is whether the failure to proceed impl[ies] a lack of reasonable grounds for prosecution." *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997) (internal quotations and citation omitted).

After reviewing Pal's medical records from Norwalk Hospital (presumably referring to her blood alcohol content), Attorney Donoghue had concerns about "proving specific elements of the defendant's specific intent[] to act with respect to certain conduct on the date in question." ECF No. 177-42 at 3. This concern caused her to drop the charges and file a substitute information. Here, there is no ambiguity that the State's Attorney abandoned the three charges because she did not think she could prove all of the statutory elements of the offenses. "[A] termination on the ground that the prosecution is unable to prove its case beyond a reasonable doubt is . . . sufficient to show favorable termination." *Virgil v. City of New York*, No. 17CV5100, 2019 WL 4736982, at \*7 (E.D.N.Y. Sept. 27, 2019). In *Virgil*, the district court determined that dismissal pursuant to the prosecutor's statement that he could not prove the charges beyond a reasonable doubt goes to the sufficiency of the evidence against Plaintiff and satisfied the favorable termination element:

> [g]iven that a lack of sufficient evidence in a criminal case entitles a defendant, as a matter of law, to a judgment of acquittal, . . . such a dismissal is more than one that "leaves the question of guilt or innocence unanswered," . . . . Rather, the state is explicitly stating that it cannot overcome the presumption of innocence afforded to Plaintiff. Without sufficient evidence, Plaintiff reverts back to his presumptive state of innocence. Therefore, the Court finds that post-*Lanning*, a dismissal based on the state's express inability to prove its case beyond a reasonable doubt is sufficient to show a favorable termination for a § 1983 malicious prosecution claim.

2019 WL 4736982, at *7.  *See Rosario v. City of New York*, No. 18 CIV. 4023, 2019 WL 4450685, at *4 (S.D.N.Y. Sept. 16, 2019) (holding the Plaintiff adequately pled favorable termination where the prosecutors did not believe they could prove the case).  The circumstances of the dismissal in this case constitute an "affirmative indication[] of innocence" and establish favorable termination. *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018).  Summary judgment as to the malicious prosecution claim with respect to the charges of assault and attempted assault on a public safety officer/health care personnel is denied.[22]

### E.    Count 5: Malicious Abuse of Process under § 1983

Pal alleges a claim of malicious abuse of process on the grounds that "defendants lacked probable cause to initiate criminal proceedings against [her]"; "issued legal process to place [her] under arrest;" arrested her "in order to obtain collateral objective outside the legitimate ends of the legal process;" and "acted with intent to do harm to Plaintiff without excuse or justification."  ECF No. 49 at ¶¶ 115-18.

"The torts of malicious prosecution and abuse of process are closely allied.  While malicious prosecution concerns the improper issuance of process, '[t]he gist of abuse of process is

---

[22] Defendants summarily assert that the fact that Pal "was found guilty of the substitute charge of creating a public disturbance is certainly not indicative of her innocence."  ECF No. 152-1 at 34.  Where, as here, there is essentially a mixed verdict in a plaintiff's underlying criminal proceedings, the court "considers whether the acquittal charge and the conviction charge are sufficiently distinct" to constitute a favorable termination. *Bailey v. City of New York*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015).  Factors considered include "(1) disparity in sentencing ranges; (2) the elements of each crime; and (3) whether the crimes were related or separate acts."  *Id.*  The defendants did not provide any legal analysis of this issue and on the record before me, I cannot find that the infraction for which Pal was convicted was so intertwined with the dismissed charges that she cannot make out a favorable termination.  *See Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989) (where plaintiff was convicted of disorderly conduct but acquitted of resisting arrest, the Second Circuit held that the two offenses arose out of distinct allegations, had different elements, and were thus distinct offenses, noting that to hold otherwise "would be particularly inappropriate in this case, where the charge for which [the plaintiff] was acquitted was more serious than the one for which he was convicted.")

the improper use of process after it is regularly issued.'" *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citation omitted). "[A]n abuse of process claim may only be based on events *subsequent to* initiation." *Miles v. City of Hartford*, 445 Fed. App'x 379, 383 (2d Cir. 2011) (emphasis in original). In a § 1983 claim alleging malicious abuse of criminal process, the elements are drawn from applicable state law. *Cook*, 41 F.3d at 79–80. "Under Connecticut law, a plaintiff claiming malicious abuse of process must show that legitimate legal process was used '*primarily* to accomplish a purpose for which it was not designed.'" *Wall v. Cetran*, 100 F.3d 943, 1996 WL 47974 (2d Cir. 1996) (unpublished opinion) (emphasis in original; quoting *Mozzochi v. Beck*, 204 Conn. 490, 494 (1987)). "Under this standard, liability will not attach where the process is used for the purpose for which it was intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." *Id.* (citing Restatement (Second) of Torts, § 682 (1977)). *See Zak v. Robertson*, 249 F. Supp. 2d 203, 209 (D. Conn. 2003) ("An improper motive alone cannot support a claim for abuse of process unless the plaintiff demonstrates that the defendant intended to achieve some end result that is distinct from criminal punishment (*i.e.* fine and/or imprisonment).")

Pal argues that in her criminal trial, the defendants failed to produce certain audio recordings. ECF No. 175 at 41, 49; ECF No. 175 at 24 n.1. Even if true, this does not demonstrate that the defendants used the legitimate legal process primarily to accomplish a purpose for which it was not designated. *Miles,* 445 Fed. App'x at 384 (affirming summary judgment where plaintiff "provided no evidence to show that [defendant officer's] primary reason for proceeding against her was improper"). *See New England Redemption v. Silver Realty P'ship*, No. 094967, 1990 WL 290103, at *2 (Conn. Super. Ct. Aug. 1, 1990) (plaintiff must allege that "defendants had engaged in overt acts for a collateral purpose unrelated to the lawsuit they were prosecuting.") Because Pal

has not come forward with evidence to demonstrate a material issue of fact concerning any such improper use, defendants' motion for summary judgment as to her claim of malicious abuse of process is granted.

## F. Count 7: Conspiracy

Pal alleges that the defendants "conspired and acted in concert to engage in conduct which was unlawful, false and fraudulent to cause the arrest, prosecution, and detention of Plaintiff." ECF No. 49 at ¶ 135. The defendants argue that this claim fails because Pal has not alleged an underlying constitutional violation or shown that there was a meeting of the minds to act in a manner that deprived her of her rights. ECF No. 152-1 at 37.

To prove a conspiracy to violate civil rights under 42 U.S.C. § 1983, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "Thus, in order to recover Section 1983 damages for conspiracy, Plaintiffs must prove that their constitutional rights were actually violated." *Cipolla v. Cty. of Rensselaer*, 129 F. Supp. 2d 436, 450 (N.D.N.Y.), *aff'd*, 20 Fed. App'x 84 (2d Cir. 2001).

As discussed, Pal has not submitted evidence suggesting a false arrest, illegal seizure, or abuse of process. Accordingly, the defendants are entitled to summary judgment on Pal's conspiracy claim as to these alleged constitutional violations. *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011) ("[A] § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation. . . . As it has been established that there was no constitutional violation, there can be no conspiracy.") However, Pal has submitted evidence to support a malicious prosecution claim as to Smaldone and EMT Monahan arising from her

allegations that they falsified their statements concerning her conduct in the ambulance. Under her version of events, Pal heard Smaldone tell EMT Monahan that "we're going to teach her a lesson," the three of them assaulted Pal in the ambulance, and Smaldone and EMT Monahan falsely stated that she had assaulted them, ostensibly to "cover up" the alleged sexual assault, resulting in her arrest and prosecution. ECF No. 177-1 at ¶¶ 155, 219. Drawing all inferences in favor of the plaintiff, see *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), a reasonable finder of fact could conclude that a conspiracy existed involving Smaldone and the EMTs and that there was at least one act taken in furtherance of the conspiracy. Summary judgment as to this claim is denied as to Smaldone.

### G.      Count 8: Assault and Battery

Pal also brings a state law claim against the defendants for assault and battery. ECF No. 49 at ¶¶ 140-42. This claim appears premised on the allegations concerning the force used to effect her arrest, the patdown, and the sexual assault in the ambulance.

Under Connecticut law, "assault" occurs when one intentionally places another in apprehension of bodily harm; and "battery" occurs when one intentionally causes harmful or offensive contact with another. *Alteiri v. Colasso*, 168 Conn. 329, 334 & n.3 (1975). "To prevail on a claim for assault and battery, plaintiff must establish that a defendant applied force or violence to him and that the application of such force or violence was unlawful." *Odom v. Matteo*, 772 F. Supp. 2d 377, 395 (D. Conn. 2011) (quoting *Williams v. Lopes*, 64 F. Supp. 2d 37, 47 (D. Conn. 1999)).

"The Second Circuit has recognized that state claims for assault and battery and section 1983 claims for excessive force are essentially the same, with the exception that a plaintiff must prove that the defendant acted under color of law to succeed on a section 1983 excessive force

claim." *Tyus v. Newton*, No. 3:13CV1486, 2016 WL 6090719, at *19 (D. Conn. Oct. 18, 2016). In cases where "genuine issues of fact preclude summary judgment on [a plaintiff's] excessive force claim, summary judgment on the common law claim for assault and battery generally must also be denied." *Greene v. City of Norwalk*, No. 3:14CV1016, 2017 WL 1086174, at *10 (D. Conn. Mar. 21, 2017); *see also Betancourt v. Slavin*, 676 F. Supp. 2d 71, 80 (D. Conn. 2009) ("Because the Court has found that a genuine issue of material fact exists as to plaintiff's claim of excessive force, it necessarily follows that questions arise as to the reasonableness of defendants' use of physical force pursuant to state law."). Because I have concluded that a genuine issue of material fact exists as to the reasonableness of the force used by the defendants in arresting Pal on April 29, I also deny their motion for summary judgment with respect to Pal's assault and battery claims arising out of the same conduct.

Pal also alleges that Smaldone held her down in the ambulance while EMT Monahan sexually assaulted her. ECF No. 177-1 at ¶ 164. The defendants deny this allegation categorically but at this juncture, taken as true, a reasonable jury could find in favor of Pal on this claim. The ultimate resolution of who is telling the truth must be made by a jury, since there are clearly disputed issues of fact and credibility determinations that cannot be made by a court on a motion for summary judgment. Accordingly, summary judgment is denied insofar as this claim is premised on the sexual assault.

Finally, Pal alleges that during the patdown, Tyler "grabbed" her breasts. ECF No. 177-2 at 134; ECF No. 177-1 at ¶ 88. Defendants argue that the pat-down was proper and deny that Pal was "groped." ECF No. 152-1 at 22; ECF No. 177-43 at 145. They point to the video evidence, which they argue does not support Pal's version. ECF No. 152-1 at 22. At the summary judgment stage, a court may rely on "a videotape [in the record] capturing the events in question" where, as

here, "[t]here are no allegations or indications that th[e] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Upon review of the dashcam footage, I find that no reasonable jury could believe Pal's version of events. The video reveals that Tyler conducted a brief pat-down search of Pal, over her clothing, in which he placed his hands on her legs, abdomen, torso, and head. Defs' Ex. G at 14:18:42-51. The pat-down was brief and non-invasive, and is clearly visible in the video. Summary judgment is granted as to this aspect of Pal's assault claim.

**H.      Count 10: Intentional Infliction of Emotional Distress**

Count 10 asserts a claim for intentional infliction of emotional distress. Under Connecticut law, such a claim requires the plaintiff to show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Fernandez v. Clean Harbors Envtl. Servs., Inc*., No. 3:05CV1390, 2006 WL 8447751, at *2 (D. Conn. May 30, 2006) (citations omitted.) Rather, the conduct must be "of a nature that it is especially calculated to cause, and does cause, mental distress of a very serious kind." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000). "The question of whether conduct is 'reasonably regarded' as extreme and outrageous is initially a question for the

40

court; an intentional infliction of emotional distress claim should be submitted to a jury only when the court finds that 'reasonable minds may differ' on this question." *Lachira v. Sutton*, No. 305CV1585, 2007 WL 1346913, at *21 (D. Conn. May 7, 2007). "Both federal and state courts in Connecticut have interpreted the qualification of 'extreme and outrageous conduct' strictly." *Mercado v. Prrc, Inc.*, No. 3:15CV637, 2015 WL 6958012, at *2 (D. Conn. Nov. 10, 2015) (internal quotation marks and citation omitted).

Defendants point to Pal's arrest and medical transport, which they claim were "valid" and argue that because their "actions were entirely reasonable," judgment in their favor is warranted. ECF No. 152-1 at 45. As stated above, I agree that her arrest was supported by at least arguable probable cause and that the defendants did not violate her constitutional rights in initiating an emergency medical examination or in patting her down. To the extent that Pal premises her claim on these allegations, summary judgment is granted. *See Zalaski v. City of Hartford*, 704 F. Supp. 2d 159, 176 (D. Conn. 2010) ("As a matter of law—absent other factors that may constitute 'extreme and outrageous' conduct—an arrest will not be considered intentional infliction of emotional distress if the arresting officer has probable cause to make the arrest.").

But Pal does not rely solely on these allegations. Rather, she cites her claims concerning excessive force in her arrest; the defendants' failure to watch her son while he was outside and discussion with a neighbor about finding someone to watch him; Tyler's alleged "muslim bitch" comment; the sexual assault; and the theft. ECF No. 175 at 53-54.

As to her claim of excessive force in pulling her out of the house, as recounted above, a reasonable jury could conclude that the defendants' conduct was outrageous and that they should have known that emotional distress was the likely result of such conduct. *See Doe v. Smereczynsky,* No. 3:16CV394, 2018 WL 4266084, at *8 (D. Conn. Sept. 6, 2018) (permitting "intentional

41

infliction of emotional distress claim to proceed based on essentially the same facts that support the excessive force claim. Even when an arrest is lawful, the force used to effectuate it may be found unlawful"); *Clark v. Dowty*, No. 3:05CV1345, 2007 WL 2022045, at *14 (D. Conn. July 9, 2007) (concluding that "[b]ecause the Court has found that material issues of fact exist regarding plaintiff's claim of excessive force, summary judgment is improper as to plaintiff's claim of intentional infliction of emotional distress"); *Betancourt v. Slavin*, 676 F. Supp. 2d 71, 81 (D. Conn. 2009) ("Because summary judgment was denied in plaintiff's excessive force claim, the Court cannot grant summary judgment on the intentional infliction of emotional distress claim.").

Similarly, summary judgment is denied insofar as count 11 rests on Smaldone's alleged involvement in the sexual assault. *See Santos v. Bailey*, No. HHDCV156057532S, 2016 WL 1315372, at *4 (Conn. Super. Ct. Mar. 7, 2016) (alleged conduct of intentionally and forcefully grabbing the plaintiff's genitalia and vaginal area was extreme or outrageous.) Summary judgment is also denied to the extent the intentional infliction of emotional distress claim relies on Cipolla's alleged theft of items from the home. Cipolla denies any theft, but when Pal's daughter's affidavit is credited, a reasonable juror could find that Cipolla, who was ostensibly watching over Pal's children in her home after she had been forcibly (though lawfully) removed from the premises, used the opportunity to invade her privacy by searching areas of the home unrelated to his investigation and then stealing valuable items from Pal. This is sufficient to deny summary judgment on this portion of the intentional infliction of emotional distress claim.

Other allegations, however, even if true, fall short. To the extent that Pal alleges that the defendants inflicted intentional emotional distress by failing to watch her son and speaking with neighbors about the need to find someone to watch him, these allegations do not so "shock the conscience" as to constitute intentional infliction of emotional distress. *Doe v. Town of Greenwich*,

422 F. Supp. 3d 528, 545 (D. Conn. 2019).  Moreover, nonfeasance does not constitute extreme and outrageous conduct for the purposes of an intentional infliction of emotional distress claim. *See Williams v. Cmty. Sols., Inc*., 932 F. Supp. 2d 323, 337 (D. Conn. 2013) (dismissing claim alleging defendant conducted insufficient investigation because "Connecticut courts have been unwilling to hold defendants liable for nonfeasance or failure to intercede, even where those defendants knew that misfeasance or harm was occurring or was likely to occur.")  Similarly, Tyler's alleged singular comment (which, as noted above, cannot be heard on the dashcam recording) does not rise to level of extreme and outrageous conduct.  *See, e.g., Carrol v. Allstate Ins. Co*., 262 Conn. 433, 443 (2003) ("Conduct on the part of the defendant that is merely insulting . . . is insufficient to form the basis for an action based upon intentional infliction of emotional distress.").

## I.       Count 11: Theft and Larceny

Pal asserts a claim of "theft and larceny" against Cipolla based on her allegation that he took money and gold jewelry from her home.[23]  ECF No. 49 at ¶¶ 57-58.

"Statutory theft under § 52-564[24] is synonymous with larceny under General Statutes § 53a-119." *Deming v. Nationwide Mutual Ins. Co.,* 279 Conn. 745, 771 (2006).  "Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." *Those Certain Underwriters at Lloyd's, London v. Cooperman*, No.

---

[23] There is no evidence in the record against Smaldone and Tyler as to this claim.  As a result, summary judgment is granted as to these defendants on count 11.

[24] Conn. Gen. Stat. § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

X03CV034022302S, 2006 WL 3316847, at *7 (Conn. Super. Ct. Oct. 27, 2006), *aff'd,* 289 Conn. 383 (2008).

Defendants argue that Cipolla is entitled to summary judgment because Pal has not submitted any evidence in support of this claim. Cipolla was alone in Pal's house only briefly, defendants maintain, and SRO MacLean, who was on the scene, avers that she did not witness Cipolla remove any property. ECF No. 154-12. However, Pal offers the affidavit of her daughter who states she witnessed Cipolla going through closets and drawers and taking a gold necklace and cash and putting them in his pocket.[25] ECF No. 179-2. This evidence, viewed in the light most favorable to Pal, is such that a reasonable jury could decide in her favor and raises a genuine dispute of material fact as to this claim.

**J.      Count 9:    Negligent Infliction of Emotional Distress**
**        Count 12:  Negligence**

In count 9, Pal alleges that the defendants' conduct created an unreasonable risk of causing her severe emotional distress. ECF No. 49 at ¶ 144. In count 12, Pal asserts a negligence claim as to the Town of Wilton in that it failed to properly train the individual defendants in the use of force, failed to properly supervise them in regard to the incident in question, and "had notice of but repeatedly failed to make any meaningful investigation into charges that its police officers were repeatedly violating Plaintiff's rights under the Constitution." ECF No. 49 at ¶¶ 159-60. Defendants argue that these negligence claims, which are premised on the April 29 events and the May 29, 2015 warrant and subsequent arrest, are time-barred under Conn. Gen. Stat. § 52-584 . ECF No. 152-1 at 50. Pal filed this lawsuit on April 10, 2018. ECF No. 1.

---

[25] See footnote 8.

The Connecticut statute of limitations for personal injury claims based on negligence is "two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered." Conn. Gen. Stat. § 52–584.

In a footnote, Pal cursorily asserts that the defendants did not produce certain audio recordings in the underlying criminal prosecution (Def's Exhibits E-1, E-6, E-9, E-11, E-18, E-20, and E-21)[26] and that this "act of deliberately withholding material evidence to prevent discovery of their own unlawful actions results in the tolling of any applicable statutes of limitations which Defendants are now claiming as affirmative defenses." ECF No. 175 at 24-25 n.1; ECF No. 175 at 49-50.

Even assuming the truth of Pal's allegations, without more, they are not a basis for equitable tolling. "Federal courts typically refer[ ] to state law for tolling rules, just like they do for statute of limitations rules." *Thompson v. Rovella*, No. 3:15CV1742, 2017 WL 601399, at *6 (D. Conn. Feb. 14, 2017) (internal quotation marks and citation omitted). *See Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000) ("federal law of equitable tolling governs plaintiffs' federal cause of action while the state law of equitable tolling governs plaintiffs' state law claims"), *aff'd sub nom. Black Radio Network, Inc. v. Nynex Corp.*, 14 Fed. App'x 111 (2d Cir. 2001).

Under Connecticut law, equitable tolling is a "doctrine that the statute of limitations will not bar a claim if the plaintiff, despite diligent efforts, did not discover the injury until after the limitations period had expired." *Wiele v. Bd. of Assessment Appeals of City of Bridgeport,* 119 Conn. App. 544, 554 (2010). Like federal courts, Connecticut courts have required the "litigant

---

[26] Based on the Court's review of the record, these recordings are: E-1 – Lee call to PD main; E-6 – Cipolla call to Galpin; E- 9 – Smaldone outgoing to Ahmad; E-11 – Ahmad calling Smaldone (Sisenstein); E-18 – Cipolla message to Sunil; and E-20 - DCF; E-21 - DCF.

seeking equitable tolling [to] bear[ ] the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Doe v. Grove Sch., Inc.*, No. CV105033501, 2012 WL 1662510, at *1 (Conn. Super. Ct. Apr. 24, 2012) (citing *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221 (2012)). The Second Circuit has cautioned that "[e]quitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (citations and internal quotation marks omitted; emphasis in original).

Pal does not plead any facts suggesting that extraordinary circumstances exist with regard to her claims. She does not allege facts related to the existence of her cause of action were concealed from her by the defendants, that she was unaware of her injury, or that she was delayed in any other way that might warrant equitable tolling. Nor does she submit any evidence showing how any discovery violations in her criminal case prevented her from discovering her injuries earlier. Summary judgment is granted as to the negligence claims.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion is GRANTED IN PART AND DENIED IN PART. For the reasons stated, I GRANT the motion for summary judgment as to (1) all claims against Officer Sear; (2) all claims against the Town of Wilton; (3) the false arrest claims; (4) the illegal seizure claims arising from the hospital transport; (5) the First Amendment retaliation claim; (6) the unlawful search claim concerning the pat-down as to all defendants; (7) the malicious prosecution claim as to Cipolla and Tyler; (8) the malicious abuse of abuse process claim; (9) the conspiracy claim as to Cipolla and Tyler; (10) the assault and battery claim against Tyler as to the pat down; (11) the claims for intentional infliction of emotional distress concerning her arrest,

hospital transport, supervision of her son, and Tyler's comment; (12) the theft and larceny claims as to Tyler and Smaldone; and (13) the negligence and negligent infliction of emotional distress claims.

The claims that remain for a jury to decide are: (1) unlawful entry; (2) excessive force; (3) illegal search as to Cipolla; (4) malicious prosecution on the charges of assault and attempted assault as to Smaldone; (5) conspiracy as to Smaldone; (6) assault and battery as to the use of force in her arrest and the allegations directed at Smaldone for the alleged sexual assault in the ambulance; (7) intentional infliction of emotional distress claim as to the use of force in her arrest, as to Smaldone concerning the assault in the ambulance, and as to Cipolla for the alleged theft; and (8) the theft and larceny claim as to Cipolla.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           November 23, 2020